**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| DEEA MILLER, Individually and as Independent Administrator of the Estate of KACEY MILLER, Deceased, | ) | |
| Plaintiff, | ) | Case No. 22-cv-2029 |
| vs. | ) | Judge Colleen R. Lawless |
| VERMILION COUNTY SHERIFF'S OFFICE, ET AL. | ) | Magistrate Judge Karen L. McNaught |
| Defendants. | ) | |

**VERMILION COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NOW COME the Vermilion County Defendants, COLIN OSTERBUR, BARBARA HARBACEK and the VERMILION COUNTY SHERIFF'S OFFICE, by and through their attorneys, MICHAEL W. CONDON and G. DAVID MATHUES of HERVAS, CONDON & BERSANI, P.C., and respectfully move for summary judgment pursuant to Federal Rule of Civil Procedure 56 and this Court's Local Rules. In support thereof, Defendants state as follows:

## INTRODUCTION

Correctional officers are not doctors or psychologists. Nor are they expected to be. Rather, their job is to ensure that detainees in need are evaluated by medical professionals, and then follow the advice of those experts. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). The Vermilion County Defendants did exactly that and are therefore entitled to summary judgment.

Plaintiff's decedent Kacey Miller died by suicide in the Vermilion County Jail ("Jail") on September 27, 2020. Five days earlier, on the 22nd, Miller's cellmate told Officer Barbara Harbacek that Miller had attempted to hang herself the day before. Harbacek told her supervisor, Cpt. Colin Osterbur. Osterbur questioned Miller. Miller denied feeling suicidal or attempting

suicide, so Osterbur did not place her on suicide watch. But he told her that if her mindset changed or she "wanted to talk to someone," the Jail would bring someone in.

The next morning, Miller told Harbacek she wanted to talk to someone, so Crosspoint Human Services, the Jail's longtime provider of crisis mental health services, was contacted. James Dewey, a mental health professional with a master's degree in psychology arrived a few hours later. He performed a crisis evaluation on Miller and determined that she was not at imminent risk for suicide, did not need to be on suicide watch, and could be returned to the Jail's general population. Osterbur and his subordinates followed Dewey's recommendation.

Between Dewey's crisis evaluation on the 23rd and Miller's death on the 27th, Miller did not make any suicidal statements, engage in suicidal conduct, or request any mental health services. No one saw or reported any unusual behavior. Her cellmate described Miller as "normal." The Vermilion County defendants deserve summary judgment because they did not violate Miller's Fourteenth Amendment right to medical care or cause her death by suicide.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### *Parties*

1. Plaintiff's decedent Kacey Miller ("Miller") was at all relevant times a resident of Vermilion County, Illinois, and Plaintiff Deea Miller ("Plaintiff") is Kacey's mother and the administrator of her estate. (Ex. A, Pl.'s Resp. to Vermilion Interrogatories ## 1, 2)

2. Defendant Vermilion County was at all relevant times a municipal corporation operating under the laws of Illinois. (Dkt. # 5, Answer ¶ 4)

3. Defendant Colin Osterbur was at all relevant times an employee of the Vermilion County Sheriff's Office, holding the rank of "Captain," in charge of day-to-day operations at the Jail, and reporting directly to the Sheriff. (Ex. B, Osterbur Dep. pp. 8, 12)

4. Defendant Barbara Harbacek was at all relevant times an employee of the Vermilion County Sheriff's Office, and in September 2020 was still in her initial 90-day probationary training period. (Ex. C, Harbacek Dep. pp. 14–15)

5. Defendant Crosspoint Human Services ("Crosspoint") is a community mental health organization located in the County and the recipient of a grant from the State of Illinois to provide crisis evaluations throughout the County, including but not limited to the Jail. (Ex. D, Crosspoint 30(b)(6) Dep. p. 25; *see also* Crosspoint Human Services, "About Us," *available at* https://crosspointhumanservices.org/about-us/ (last accessed April 30, 2024)

6. Defendant James Andrew Dewey was at all relevant times a mental health professional and crisis counselor employed by Crosspoint. (Ex. E, Dewey Dep. pp. 16–17)

***Vermilion County Jail Background and Procedures***

7. Patrick Hartshorn has been the elected sheriff of Vermilion County since 1990. Sheriff Hartshorn is, per Illinois statute, ultimately responsible for overseeing the Jail, but delegates much of the day-to-day management of the Jail to the Jail Captain, who reports directly to Hartshorn. (Ex. F, P. Hartshorn Dep. pp. 12, 14, 20)

8. In September 2020, the country was still suffering from the COVID 19 pandemic, which created additional challenges for jail administrators by consuming time, attention, resources, and requiring procedural changes. (Ex. G, Pl.'s Expert S. Sinner Dep. pp. 40–41)

9. In September 2020, detainees at the Jail could request medical care or mental health care by sending a request through an electronic kiosk, which was located in each cell block. These requests would be reviewed each day by RN Shelly Harding and then triaged before being addressed. (Ex. H, Harding Dep. p. 21)

10. Detainees could also directly ask officers for medical or mental health care, and when that happened, the officer would either tell the detainee to make a request through the kiosk or the officer would relay the request to the Jail captain or nurse. (Ex. C, Harbacek Dep. pp. 32, 35)

11. The Jail employs a Nurse Practitioner, Steve Skimehorn. He has experience seeing psychiatric patients and comes to the Jail once a week and is able to prescribe mediations for mental health conditions. (Ex. H, Harding Dep. pp. 19–20)

12. The Jail does not employ a psychiatrist because there is only one psychiatrist in Vermilion County, and the Jail cannot afford him. (Ex. F, P. Hartshorn Dep. p. 54)

13. In the five years before Kacey Miller's death in the Jail, there were six suicide attempts at the Jail, one of which resulted in a death. (Ex. I, Heaton Dep. pp. 91–92)

14. The Jail relies on Crosspoint's qualified mental health professionals to perform a crisis evaluation on detainees who may be experiencing suicidal ideation. (Ex. F, P. Hartshorn Dep. p. 53; Ex. H, Harding Dep. p. 27; Ex. D, Crosspoint 30(b)(6) Dep. pp. 25–26)

15. When called, the Crosspoint mental health professional will conduct a crisis evaluation and then make a clinical judgment whether the detainee should remain in (or be placed in) a padded cell on suicide watch or can return to general population. (Ex. D, Crosspoint 30(b)(6) Dep. pp. 25–26; Ex. I, Heaton Dep. p. 60)

16. The correctional officers and medical staff at the Jail always follow the Crosspoint mental health professional's housing recommendation regarding whether the detainee should be placed or kept on suicide watch or returned to general population. (Ex. D, Crosspoint 30(b)(6) Dep. pp. 25–26; Ex. H, Harding Dep. p. 79; Ex. J, Pl.'s Expert Dr. Patterson Dep. p. 89)

17. When a detainee is placed on suicide watch, the detainee is, among other things, put into a padded cell with no furniture, is given a "suicide smock" to wear, is denied any personal items, and is checked every 15 minutes. These protocols are designed to severely reduce the ability of a detainee to engage in suicide or self-harm. (Ex. C, Harbacek Dep. pp. 44–46; Ex, I, Heaton Dep. pp. 85–87)

18. On certain occasions, detainees may make a threat of suicide, or report that another detainee was suicidal, for strategic rather than medical reasons, and the correctional officers were aware of the possibility. (Ex. I, Heaton Dep. pp. 67, 183)

19. Jail correctional officers receive initial training on detainee mental health and suicide prevention as part of their training at the academy. (Ex. I, Heaton Dep. pp. 19, 34)

20. Correctional officers also attend an annual refresher course on suicide prevention, which is a series of videos put out by the Illinois Department of Corrections. (Ex. F, P. Hartshorn Dep. pp. 47–48; Ex. I, Heaton Dep. pp. 39–40)

21. Correctional officers received additional on-the-job training through experience, first through a formal 90-day program where they work beside more experienced officers, and then less formally through continued observation and experience. (Ex. I, Heaton Dep. pp. 19, 171; Ex. B, Osterbur Dep. p. 113)

22. The Jail is inspected every year by personnel from the Illinois Department of Corrections. It passed every year between 2017 and 2020. (Ex. G, Pl.'s Expert S. Sinner Dep. pp. 56–57; *see also* Ex. K, Jail Inspection Reports, VERMILION 4423–4533)

23. At all relevant times, the County's policy was that correctional officers should know and comply with the Illinois County Jail Standards, which give more details on some topics, including suicide prevention, than the Jail's policy manual. (Ex. F, P. Hartshorn Dep. p. 50; Ex. I, Heaton Dep. pp. 27, 171–72; Ex. B, Osterbur Dep. p. 114)

24. At all relevant times, the Jail's procedure regarding suicide prevention includes asking questions related to prior mental health treatment and suicidal ideation during booking, and, if the detainee answered yes, having medical or mental health professionals follow up. (Ex. I, Heaton Dep. pp. 30–31)

25. At all relevant times, the Jail's custom and practice is that any correctional officer can direct that a detainee be sent to suicide watch if the detainee by "statement or action" causes the Jail employee to fear that the detainee is at an imminent risk of self-harm such that officers "need to be observing them more frequently." (Ex. I, Heaton Dep. pp. 84–85)

26. Once a detainee is sent to suicide watch, the Jail will ask Crosspoint for a mental health professional to evaluate the detainee's mental state and determine if the detainee can be safely returned to the general population. (Ex. I, Heaton Dep. p. 85)

27. Vermilion County does not train Crosspoint counselors on how to assess persons in crisis or what steps to take if a person is in crisis, because the counselors get that training from Crosspoint and "know what to do." (Ex. E, Dewey Dep. p. 21)

28. Vermilion County does not train Crosspoint counselors how to determine if a person is in crisis, and Jail personnel are not qualified to train Crosspoint mental health professionals on that topic. (Ex. E, Dewey Dep. p. 21)

29. If a mental health professional makes a recommendation regarding detainee housing, specifically whether the detainee needs to be on suicide watch or can be returned to general population, it is proper procedure for correctional officers to follow that mental health professional's recommendation. (Ex. J, Pl.'s Expert Dr. Patterson Dep. pp. 89–90).

***Kacey Miller's Arrest and Booking***

30. Kacey Miller was booked into the Vermilion County Jail shortly after 4 pm on Sunday, September 19, 2020, and, as part of that process, the booking officer observed her behavior and asked screening questions. (Ex. I, Heaton Dep. pp. 30–31; Ex. L, Questionnaire, VERMILION 03637–38)

31. At booking, Miller showed no unusual behavior, such as making threats of suicide, exhibiting extreme depression, or acting withdrawn, and she answered "no" when asked if she had previously been treated for mental health problems or was taking medication for such problems. (Ex. I, Heaton Dep. pp. 30–31; Ex. L Questionnaire, VERMILION 03637–38)

32. While the Jail prohibits detainees from bringing any item of clothing into the jail, Miller smuggled a belt past booking and into the Jail. (Ex. C, Harbacek Dep. pp. 52, 104–05)

33. Miller was initially housed in a dormitory room known as "3-Dorm" with several other female detainees as part of then-existing COVID protocols. (Ex. I, Heaton Dep. p. 81; Ex. B, Osterbur Dep. p. 38)

34. Harbacek was hired as a correctional officer on July 13, 2020, and did not interact with Miller until September 22, 2020. (Ex. C, Harbacek Dep. pp. 14–15, 92)

35. While Osterbur knew of Miller before September 2020 because Miller had been detained at the Jail before, he was not aware of any specific information regarding her mental health conditions or prior suicide attempts. (Ex. B, Osterbur Dep. p. 67)

36. Around 1:45 pm on September 21, Miller attempted to hang herself in the shower of 3-Dorm using the smuggled belt, but she fell in the process and did not succeed. (Ex. M, Lewis Dep. pp. 19–20; *see also* Ex. N, 3-Dorm Video, at 1:43:29 pm – 1:44:05 pm)[1]

37. This incident caused some noise in 3-Dorm, and a female correctional officer responded. But Miller told the other female detainees not to report the suicide attempt, and the other detainees agreed, and they falsely told officers responding to the noise that nothing significant happened. (Ex. C, Harbacek Dep. pp. 100–01; Ex. O, Carey Dep. pp. 28–29; *see also* Ex. N, 3-Dorm Video, at 1:43:29 pm – 1:44:05 pm)

38. Miller had been diagnosed with both mental health and substance abuse disorders, a dual diagnosis shared by around 30 percent of detainees in the United States. (Ex. G, Pl.'s Expert S. Sinner Dep. p. 62)

***Another Detainee Reports that Miller Attempted Suicide***

39. On September 21, 2022, Miller requested medical care through the Jail's kiosk for heroin withdrawal symptoms. (Ex. H, Harding Dep. p. 46; *see also* Ex. P, Inmate Medical Request Form, VERMILION 2525)

[1] Depending on the computer and program one uses to view this video and the later video from A-Block, the timestamp may be off by exactly one hour. Counsel is not sure why, but this has happened throughout the case.

40. On September 22, 2020, Officer Harbacek escorted Miller to Nurse Harding pursuant to Miller's request the date before, and at the same time escorted Miller's cellmate Toi Lewis to be seen for an injured eye. (Ex. C, Harbacek Dep. pp. 92, 94)

41. Nurse Harding was familiar with Miller from Miller's prior detentions, had treated her between five and seven times, and had a good rapport with Miller. (Ex. H, Harding Dep. pp. 43, 50, 77)

42. Nurse Harding had given Miller a 3-day protocol of heroin withdraw medications on prior occasions, and on September 22, 2020, prescribed the same 3-day protocol as before. (Ex. H, Harding Dep. pp. 44–45; Ex. Q, Physical Health Assessment, VERMILION 2524)

43. At some point during this medical visit, Miller's cellmate Toi Lewis told Harbacek that Miller had smuggled a belt into the Jail, and that the day before (the 21st), Miller had attempted to hang herself in 3-Dorm. (Ex. C, Harbacek Dep. pp. 98–100)

44. Lewis's statement was the first time any Jail employee was told that Miller attempted suicide or self-harm in September 2020. (Ex. C, Harbacek Dep. p. 101; Ex. G, Pl.'s Expert S. Sinner Dep. pp. 41–42)

45. After hearing this report, Officer Harbacek took Lewis back to the cell she shared with Miller, and, with Lewis' help, confiscated the belt. Harbacek then told Captain Osterbur what Lewis had reported. (Ex. C, Harbacek Dep. pp. 108–09; Ex. M, Lewis Dep. p. 20)

46. Nurse Harding also learned of Lewis' report. Nurse Harding asked Miller if she was suicidal, and Miller said no, and also told Harding that if she (Miller) was going to kill herself, she would tell Harding. (Ex. H, Harding Dep. pp. 49–50; see also Ex. Q, Physical Health Assessment, VERMILION 2524)

47. Miller also told Harding that Miller only smuggled in the belt to see if she could evade detection. Miller did not appear sad or upset. (Ex. H, Harding Dep. p. 49)

48. Osterbur met with Miller in the Jail's attorney room. Osterbur asked Miller if she had attempted suicide or had thoughts of suicide. (Ex. B, Osterbur Dep. pp. 81–82)

49. Miller told Osterbur she had not attempted suicide and did not have suicidal thoughts. (Ex. B, Osterbur Dep. p. 82)

50. Osterbur did not see any marks on Miller's neck or other physical indications that Miller had tried to hang herself. (Ex. B, Osterbur Dep. p. 83)

51. Osterbur told Miller that if her mental state changed, she should tell officers or a nurse that she wanted to talk to someone, and the Jail would facilitate that request. (Ex. B, Osterbur Dep. p. 82)

52. Osterbur decided that Miller was not an imminent suicide risk and allowed her to return to general population rather than placing her on suicide watch. (Ex. B, Osterbur Dep. pp. 75–76)

***Miller is Evaluated and Cleared by a Mental Health Professional***

53. The next morning, the 23rd, Miller told Officer Harbacek that she wanted to talk to someone but did not say why. Miller appeared "a little bit more sad" but was not crying. Harbacek inferred that the request related to the prior day's events. (Ex. C, Harbacek Dep. pp. 123–25)

54. Officer Harbacek relayed Miller's request to Captain Osterbur and Nurse Harding. One of them called Crosspoint and asked for a mental health professional to assess

Miller for "suicidal ideation." (Ex. C, Harbacek Dep. pp. 127–28; Ex. H, Harding Dep. pp. 55, 65)

55. Crosspoint counselor Dewey met with Miller that morning between 10:55 am and 11:32 am and performed a crisis assessment. (Ex. R, Dewey's ATI # 6)

56. Dewey conducted the assessment in the Jail's visiting room, separated from Miller by glass, but was able to see all of her body language. (Ex. E, Dewey Dep. pp. 107, 175)

57. Jail staff gave Dewey as much time as he needed, and no one from the Jail pressured or influenced Dewey on how to conduct that assessment. (Ex. E, Dewey Dep. p. 175; Ex. J, Pl.'s Expert Dr. Patterson Dep. p. 91)

58. At the time he performed the assessment of Miller, Dewey was a Qualified Mental Health Professional with a master's degree in psychology, had performed several hundred crisis assessments for suicidal ideation, and had received classroom and on-the-job training in the field of mental health. (Ex. E, Dewey Dep. pp. 132, 158–163)

59. Dewey did not ask Harbacek, Osterbur, Harding, or any other Jail employee for details on Miller's background or conduct while in the Jail because Dewey's "professional judgment" was that it was "best" not to seek such "hearsay" information from third parties so that "someone else's opinion" did not cloud his own assessment. (Ex. E, Dewey Dep. pp. 58, 175-76)

60. No one from the Jail concealed information about Miller from Dewey or provided him with false information about Miller. (Ex. J, Pl.'s Expert Dr. Patterson Dep. pp. 92–93)

61. No one from the Jail would have had reason to know if Dewey's crisis assessment of Miller fell below the standard of care. (Ex. J, Pl.'s Expert Dr. Patterson Dep. p. 92)

62. After completing his assessment, Dewey made the clinical judgment that Miller was at a "moderate" risk of harm to self with the ability to "safety plan" and was not at a high or immediate risk of suicide. (Ex. E, Dewey Dep. pp. 124–25)

63. In Dewey's mind, a "moderate" risk of self-harm means there is a moderate risk that sometime in the future the person might try and self-harm in some way, not necessarily suicidal harm, and who has some suicidal risk factors but no intent or plan and is not in crisis. (Ex. E, Dewey Dep. pp. 54, 124, 126)

64. As a matter of regular practice, Dewey would not tell a correctional officer if he believed a detainee was at a "moderate" risk and he did not do that with Miller. (Ex. E, Dewey Dep. pp. 54, 179)

65. Consistent with his regular practice upon completing a crisis assessment, once Dewey finished, he notified Sgt. Kevin Maskel over the intercom that Miller was clear to be returned to general population. (Ex. E, Dewey Dep. p. 102; Ex. S, Sgt. Maskel Dep. p. 66)

66. After finishing the assessment, Dewey told Nurse Harding, "I'm done with her, I think she's fine" and that he was recommending Miller go back to general population. Harding responded, "Ok" or "good." (Ex. E, Dewey Dep. pp. 103, 186)

67. Even though Dewey's notes state that he "consulted" with Maskel and Harding, Dewey did not solicit input from either of them regarding Miller's housing. By "consulted," Dewey meant that he told Maskel and Harding about the decision he reached. (Ex. E, Dewey Dep. pp. 102, 186–87; *see also* Ex. J, Pl.'s Expert Dr. Patterson Dep. pp. 95–96)

68. Dewey's recommendation was followed, and Miller was returned to general population. (Ex. B, Osterbur Dep. p. 88; Ex. S, Sgt. Maskel Dep. p. 66)

69. Whenever a Crosspoint counselor conducted a crisis evaluation on a detainee and recommended either that the detainee be sent to or remain on suicide watch, or, on the other hand, that the detainee was cleared for general population, the Jail always followed that recommendation. (Ex. H, Harding Dep. pp. 78–79; Ex. I, Heaton Dep. pp. 183–84; Ex. C, Harbacek Dep. p. 172; Ex. S, Maskel Dep. p. 68)

***Four Days Pass During Which Nothing Unusual Occurs***

70. From the time Dewey cleared Miller for general population on September 23, and the time Miller entered her cell to take her life on September 27, Miller did not tell any correctional officer or other County employee that Miller was feeling suicidal. (Ex. G, Pl.'s Expert S. Sinner Dep. p. 47; *see also* Ex. H, Harding Dep. p. 75; Ex. B, Osterbur Dep. p. 90; Ex. J, Pl.'s Expert Dr. Patterson Dep. p. 98)

71. From the time Dewey cleared Miller for general population on September 23 to the time Miller entered her cell to take her life on September 27, no other detainee reported to any correctional officer that Miller had made a suicidal statement. (Ex. G, Pl.'s Expert S. Sinner Dep. p. 48; *see also* Ex. H, Harding Dep. p. 75; Ex. B, Osterbur Dep. p. 90; Ex. J, Pl.'s Expert Dr. Patterson Dep. p. 98)

72. From the time Dewey cleared Miller for general population on September 23 to the time Miller entered her cell to take her life on September 27, Miller did not request any medical care or any mental health services, either through the kiosk system or directly to any correctional officer. (Ex. G, Pl.'s Expert S. Sinner Dep. p. 48; *see also* Ex. B, Osterbur Dep. p. 90; Ex. J, Pl.'s Expert Dr. Patterson Dep. p. 97)

73. From the time Dewey cleared Miller for general population on September 23 to the time Miller entered her cell to take her life on September 27, no other detainee reported to any correctional officer that Miller attempted suicide or self-harm. (Ex. G, Pl.'s Expert S. Sinner Dep. p. 49)

74. From the time Dewey cleared Miller for general population on September 23 to the time Miller entered her cell to take her life on September 27, no other detainee reported to any correctional officer that Miller's mood or attitude underwent a significant change. (Ex. G, Pl.'s Expert S. Sinner Dep. p. 48)

75. Miller's own cellmate did not see "any signs of Kacey [Miller] wanting to harm herself" after the time the belt was removed from her cell. (Ex. M, Lewis Dep. p. 58)

76. Harbacek did not interact with or learn anything new about Miller between September 24 and 26. (Ex. C, Harbacek Dep. pp. 133, 147)

77. Captain Osterbur did not receive any new information about Miller or hear about Miller requesting services or making statements between September 23 and 27 and he was not working on September 27th. (Ex. B, Osterbur Dep. p. 90)

***The Unexpected and Sad Events of September 27th***

78. Around 10:00 am on September 27, Harbacek went into A-Block and let Miller and four other detainees out of their cells for free time. Harbacek stayed about three minutes, and during that time, Harbacek talked to the female detainees, changed the channel on the TV at their request, and saw Miller attempt to make a phone call that was not completed because the intended recipient did not pick up. (Ex. C, Harbacek Dep. pp. 147–49; Ex. T, 9/26–27/20 A-Block Video, VERMILION 00363 at 10:03:32–10:06:20)

79. Harbacek observed Miller acting normally. The window to Miller's cell was not blocked at this time. (Ex. C, Harbacek Dep. pp. 159, 173)

80. Miller was acting "like a normal person" on the morning of September 27, not "different at all." (Ex. M, Lewis Dep. p. 29)

81. Miller entered her cell at 10:11 am, shut the door, and put a female pad over the cell door to block the view to the inside. (Answer ¶ 79; Ex. M, Lewis Dep. p. 29; Ex. C, Harbacek Dep. p. 159; Ex. T, 9/26–27/20 A-Block Video, VERMILION 00363 at 10:11:28)

82. The other female detainees saw that Miller had blocked the window to her cell, and knew this was against the rules, but did not report it because they thought she just wanted privacy. (Ex. M, Lewis Dep. pp. 30–31; Ex. O, Carey Dep. p. 34)

83. The monitoring video which the correctional officers used to observe A-Block showed Miller entering her cell alone at 10:11 am, but it does not show her blocking the window, because it is not possible from the video to see if a cell window is being covered from the inside. (Ex. T, 9/26–27/20 A-Block Video, VERMILION 00363; Ex. C, Harbacek Dep. pp. 173–74)

84. At about 10:39 am, one of the other detainees opened the door to Miller's cell and saw her hanging. The female detainees started banging and calling for officers. (Ex. T, 9/26–27/20 A-Block Video, VERMILION 00363, at 10:39:39; Ex. M, Lewis Dep. p. 32)

85. Within seconds, several correctional officers, including Harbacek, Officer Tracy Acord, and Dylan Vice came running to A-Block. (Ex. T, 9/26–27/20 A-Block Video, VERMILION 00363 at 10:40:05–20; Ex. C, Harbacek Dep. pp. 154–56)

86. Officers Harbacek and Acord began getting the other female detainees back into cells in order to secure the area and eliminate any risk of escape or harm to the officers attending

to Miller. (Ex. I, Heaton Dep. pp. 100, 121, 173–74; Ex. C, Harbacek Dep. p. 156; *see also* Ex. T, 9/26–27/20 A-Block Video, VERMILION 00363 at 10:40:20–58)

87. Captain Heaton was the shift commander. He came to A-block from another part of the third floor in response to a radio call for help, initially believing that there was a fight. (Ex. I, Heaton Dep. pp. 116, 119)

88. When Heaton entered A-Block, there was a lot of commotion and Officer Vice told Heaton that Miller was hanging from the vent in her cell. Heaton cut Miller down with a pocketknife he had on his person, while Officer Vice supported Miller. (Ex. I, Heaton Dep. pp. 120, 124–25)

89. Captain Heaton started CPR on Miller, and about the same time, he called out for someone to get the AED and make sure that an ambulance had been called. (Ex. I, Heaton Dep. pp. 128–29; *see also* Ex. T, 9/26–27/20 A-Block Video, VERMILION 00363, at 10:41:00–10:51:45)

90. Paramedics arrived approximately ten minutes after the first correctional officers entered A-Block, began emergency treatment, and transported Miller to a local hospital. (Ex. T, 9/26–27/20 A-Block Video, VERMILION 00363 at 10:51:49; Answer, ¶ 92)

91. Miller never regained consciousness and was taken off life support the following day, September 28, 2020, due to complete lack of brain activity and was pronounced dead. (Ex. U, D. Miller Dep. pp. 97–98; Ex. V, Autopsy Report, VERMILION 00378–83, p. 1)

92. The Jail requested the Illinois State Police to conduct the investigation into Miller's death to avoid a conflict of interest and they did. (Ex. I, Heaton Dep. pp. 156, 158–59)

93. The State Police gave their completed investigation file to the Vermilion County State's Attorney, who determined that no criminal charges were warranted. (Ex. F, P. Hartshorn Dep. pp. 63–64)

## ARGUMENT

### I. STANDARD OF REVIEW

Courts grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" issue requires more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Although a court views the facts in the light most favorable to the non-moving party, this viewpoint does not extend to accepting "speculation or conjecture." *Citizens for Appro. Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). Rather, "[p]laintiffs must come forward with specific facts showing that there is a genuine issue for trial." *Id.*

### II. CAPTAIN OSTERBUR AND OFFICER HARBACEK ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DENIAL OF MEDICAL CARE CLAIM.

#### A. Plaintiff Must Prove That Osterbur and Harbacek Acted With "Reckless Disregard" to Miller's Risk of Suicide.

The Fourteenth Amendment gives detainees a right to objectively reasonable medical care. *Miranda v. County of Lake*, 900 F.3d 335, 353–54 (7th Cir. 2018). This includes care to mitigate the risk of suicide or self-harm. *Id.* at 349. While this "objective reasonableness" standard sounds at first like negligence, it is *not*. The law of medical malpractice is not federal constitutional law. *Id.* at 353. Indeed, even "gross negligence" will not suffice for a constitutional claim. *Id.* Rather, conduct "akin to reckless disregard" is needed. *Id.*

As the Seventh Circuit recently explained in another jail suicide case, the question is whether the defendant took "reasonable available measures to abate [the] risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious." *Est. of Wallmow v. Oneida Cnty*., 99 F.4th 385, 391 (7th Cir. 2024). The "reasonable available measures" required depend on the "'information available at the time,'" not what may be learned through "'hindsight.'" *Id.* (quoting *Kingsley v. Hendrickson,* 576 U.S. 389, 397 (2015)).

Moreover, as in all Section 1983 cases, a defendant is liable for his or her own actions, not the actions of others. *Gonzalez v. McHenry County, Ill.*, 40 F.4th 824, 828 (7th Cir. 2022). The only County employees named as defendants are Osterbur and Harbacek. The relevant issues are what they did, and what a reasonable officer in their shoes would have known or done. The actions (or lack thereof) of others are irrelevant because "[t]he doctrine of respondeat superior does not apply to § 1983 actions." *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001).[2]

**B. Lay Correctional Officers Such as Osterbur and Harbacek Act Reasonably When They Defer to Medical and Mental Health Experts.**

Time and again, the Seventh Circuit has held that "the law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so." *Berry*, 604 F.3d at 440 (affirming summary judgment for defendants on this basis and citing four other cases which did the same). Medicine is a complex and difficult field—even for trained and licensed experts. Lay persons are poorly equipped to second-guess such experts

[2] More specifically, Sgt. Maskel's actions are irrelevant. Plaintiff's untimely request to add him as a defendant was denied. (Dkt. # 32, Order, 03/04/24) Nurse Harding's actions are also irrelevant because she was never sued.

and likely to cause more harm than good if they try. That is why jail personnel who place a detainee under the care of an appropriate professional and then get out of the way prevail on summary judgment. *See, e.g.*, *McCann v. Ogle Cnty., Ill.*, 909 F.3d 881, 888 (7th Cir. 2018) (affirming summary judgment to jail captain and officer did not "contribute to or detract from the treatment" the doctor deemed appropriate).

This principle applies regardless of whether the professional is treating a mental or a physical illness. *Miranda* affirmed summary judgment to a jail chief and one of his lieutenants where a detainee died by suicide from an extended refusal to eat or drink. *Miranda*, 900 F.3d at 341–43. These non-medical personnel ensured that the detainee was under the care of medical professionals, including a psychiatrist. *Id.* at 342–43. They were entitled to rely on these professionals to provide appropriate medical care. *Id.* at 343. Other federal courts of appeal agree that correctional officers may defer to medical professionals regarding suicide risk. *See, e.g., Est. of Vallina v. Cnty. of Teller Sheriff's Off.*, 757 F. App'x 643, 647 (10th Cir. 2018) (affirming summary judgment in jail suicide case to staff who "followed the recommendations of medical professionals who examined Vallina, none of whom concluded that he presented a suicide risk.").

This principle also applies even when the detainee is in obvious distress and the treating medical professional blunders. *McGee v. Parsano*, 55 F.4th 563, 573 (7th Cir. 2022). *McGee* dealt with harrowing facts and symptoms far more obvious than anything the officers here saw regarding Miller's mental state. The detainee in *McGee* was suffering from diabetic ketoacidosis and showed symptoms including vomiting, lethargy, blood pressure, and labored breathing. *Id.* at 565–66. Correctional officers called a jail nurse who, despite an intake form noting the detainee was diabetic, told the officers that the detainee was "playing possum" and did not even take his

vital signs. *Id.* at 566–67. The officers deferred to her judgment and did not do anything more until the detainee became unconscious. *Id.* at 568. He later died. *Id.*

The Seventh Circuit nevertheless reversed the denial of qualified immunity to the officers (the culpable nurse was not part of the appeal). *McGee* did not mince words: it held that "the caselaw points decidedly" in favor of the officers having acted reasonably by deferring to the judgment of a medical professional. *Id.* at 572. The plaintiff insisted that the detainee's symptoms at least created a question of fact. *McGee* rejected that argument. It distinguished between *symptoms*, which are often obvious to a lay person, and *inadequate treatment* by a trained professional, which is not. Applied here, *McGee* demands distinguishing between suicide risk factors, which may be obvious to a correctional officer and may require that officer to refer the detainee to a mental health professional, and a mental health professional's (allegedly) incorrect evaluation of a specific detainee's suicide risk, which is not obvious.

### C. Osterbur and Harbacek's Actions Show Objective Reasonableness.

#### 1. Osterbur and Harbacek First Learn of Miller's Alleged Suicide Attempt on September 22, 2020.

Miller was booked into Jail on September 19, 2020. (SOF ¶ 30) At intake, Miller was asked numerous questions, including whether she had received prior mental health treatment or was having suicidal thoughts, and said no. (*Id.* at ¶ 31) Miller was initially housed in a dorm with several other female detainees due to COVID-19 protocols. (SOF ¶ 33) While there, she attempted to hang herself from a shower rod with a belt she had smuggled into the jail, but

slipped or fell in the process and did not succeed.[3] (SOF ¶ 32, 36) But Miller told the other detainees to conceal this (alleged) suicide attempt, and they acquiesced. (SOF ¶ 37)

Harbacek first learned of Miller's alleged suicide attempt on September 22, when Miller's cellmate Toi Lewis told Harbacek about the smuggled belt and suicide attempt. (SOF ¶¶ 43–44) Harbacek was a new officer, still on her 90-day probationary period. (SOF ¶ 34) She did what one would hope a new officer would do—alert her supervisor, Captain Osterbur. (SOF ¶ 45) She also went to Miller's cell and confiscated the belt. (*Id.*)

### 2. Captain Osterbur Directly Questioned Miller About Her Mental State, and She Denied Any Suicidal Intent.

Captain Osterbur spoke with Miller about her mental state. She denied having attempted suicide or any suicidal thoughts. ( SOF ¶¶ 48–49) Osterbur did not see any abrasions or other signs of physical injury on Miller's neck. (SOF ¶ 50) He also told her that if she wanted to talk to someone or if her mental state changed, the Jail would get someone with whom to speak. (SOF ¶ 51) Given her denial and lack of corroborating evidence, Osterbur had her placed back into general population rather than on suicide watch. (SOF ¶ 52)

This was an objectively reasonable response. For starters, "an express statement that [the deceased] was not considering suicide from the deceased himself weighs heavily against objective unreasonableness." *Est. of Wallmow*, 99 F.4th at 391; *see also Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020) (relying heavily on detainee's explicit denial of suicidal intent to affirm summary judgment in jail suicide case). Moreover, Miller was not acting strangely, and there were no

[3] The Vermilion County Defendants only concede that Miller attempted suicide on September 21 for purposes of this motion because at this stage, Plaintiff is entitled to have the evidence viewed in her favor. They otherwise contend that the video and testimonial evidence of Miller's "attempt" is ambiguous.

physical marks indicating self-harm. (SOF ¶¶ 47–50) To be sure, Miller had been diagnosed with both substance abuse and mental health issues. But this hardly sets her apart; Plaintiff's expert agreed that around 30% of detainees nationwide share this dual diagnosis. (SOF ¶ 38)

Thus, even assuming Osterbur knew or should have known more about Miller's background, he was entitled to give significant credit to her denial of suicidal ideation or actions. *See, e.g., Maxwell v. Outagamie Cnty. Jail*, 2022 WL 17300881, at *11 (E.D. Wis. Nov. 29, 2022) (finding that "it would be unreasonable to expect a jail to place every inmate with suicide risk factors similar to Maxwell on suicide watch" because "jail inmates routinely have suicide risk factors comparable to Maxwell."). The Seventh Circuit has noted that "not every prisoner who shows signs of depression or exhibits strange behavior can or should be put on suicide watch." *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003). And here, Miller did not appear distressed or show unusual behavior on the 22nd. (SOF ¶¶ 47–50) But more importantly, even assuming that Osterbur and his fellow officers "should have known not to take 'no' for an answer when [Miller] told them [s]he was not suicidal," that assumption "leads only to negligence." *Matos*, 335 F.3d at 557. Miller's claim would still fail because negligence is categorically insufficient for a denial of medical care claim. *Miranda*, 900 F.3d at 353.

#### 3. Miller Asks to Talk, and Qualified Mental Health Professional James Dewey is Brought in to Conduct a Crisis Evaluation.

The next morning, September 23, Miller told Officer Harbacek that she wanted to talk to someone. (SOF ¶ 53) Harbacek relayed Miller's request to Osterbur, and then either Osterbur or Nurse Harding asked Crosspoint to send a counselor to evaluate Miller. (SOF ¶ 54) This prompt response contrasts sharply with other cases where jail personnel faced liability for dragging their feet with such a request. *See, e.g., Pittman ex rel. Hamilton v. Cnty. of Madison, Ill.*, 746 F.3d 766,

778 (7th Cir. 2014) (denying summary judgment in a jail suicide case because a detainee allegedly requested to see a crisis counselor, and the correctional officer did not act on that request despite knowing that the detainee might have "a serious psychological condition that is beyond the officer's capacity to assess definitively.").

Crosspoint had been the exclusive provider for crisis mental health services for many years. (SOF ¶¶ 5, 14–16) A Crosspoint mental health professional would be called to conduct a crisis evaluation of the detainee, and based on the evaluation, recommend either that the detainee be placed on or remain in suicide watch, or that he or she return to general population. (SOF ¶ 15) Crosspoint's recommendation was always followed. (SOF ¶ 16)

Crosspoint employee James Dewey arrived by 11:00 am that morning. (SOF ¶¶ 6, 55) Dewey has a master's degree in psychology. (SOF ¶ 58) He had classroom and on-the-job training in evaluating people in crisis for suicide risk and had conducted several hundred crisis evaluations. (*Id.*) He was a Qualified Mental Health Processional. (*Id.*) While Osterbur, Harbacek, and the other correctional officers had some training designed for lay persons on suicide prevention, none of the, possessed these qualifications. (SOF ¶¶ 19–21, 58)

Dewey spent about 45 minutes with Miller. He had sufficient time to conduct his evaluation, and no one tried to steer his conclusions. (SOF ¶ 57) At the end, Dewey told Sgt. Maskel and Nurse Harding that Miller could return to general population. (SOF ¶¶ 65–66) In his clinical judgment, she was not at imminent risk for suicide, as she had no intent or plan and was

not in crisis.[4] (SOF ¶¶ 62–63) As always, Crosspoint's recommendation was followed, so Miller returned to general population. (SOF ¶ 68–69)

Dewey's conclusion, and his methods, are highly contested in this case. Plaintiff's expert psychologist, Dr. Marcus Patterson, argues that Dewey should have sought out more background information about Miller rather than going solely on what Miller said during the evaluation, and should have recommended that Miller be placed on suicide watch. (Defs.' SOF Ex. J, Dr. Patterson Dep. pp. 90–91) By contrast, Crosspoint's expert psychiatrist Dr. A.E. Daniels argues that Dewey's methods and his conclusion were appropriate, adequate, and consistent with the standard of care. (Ex. W, Dr. Daniels Report p. 9)

Regardless of which side has a stronger argument, the very existence of this debate proves the County's point. Lay correctional officers should not be expected to umpire *a debate between doctors* in order to avoid potentially massive liability in a wrongful death case. More to the point, it's black letter law that they are not required to. *See, e.g.*, *McGee*, 55 F.4th at 572.

**4. After Being Cleared for General Population, Miller Shows No Abnormal Behavior and Seeks No Additional Services.**

After Miller was returned to general population on the 23rd, Osterbur had no further dealings with or reports about her until she died. (SOF ¶ 77) Harbacek did not encounter Miller again until the morning of the 27th. (SOF ¶ 76) Neither Harbacek nor Osterbur received any further reports about Miller. (SOF ¶¶ 70–74)

[4] Dewey's paperwork uses the word "consult" to describe his interactions with Maskel and Harding. But Dewey testified that by "consult," he meant that he informed them of his judgment, not that he sought their input. The unrebutted testimony was that the decision was Dewey's alone. (SOF ¶ 67)

There was nothing to report. Miller did not request any mental health or medical services between September 23 and September 27. (SOF ¶ 72) Miller did not make any suicidal statements or engage in any suicidal behavior. (SOF ¶ 70) No detainee reported to any correctional officer that Miller did those things, or that she was acting strangely. (SOF ¶¶ 71–74) Miller's cellmate Toi Lewis testified that Miller was acting "like a normal person." (SOF ¶ 80)

**5. Miller Takes Her Own Life.**

Just after 10:00 am September 27, Harbacek opened the cells in A-Block for the female detainees to have free time. Miller, Lewis, and four other female detainees came out. (SOF ¶ 78) Harbacek spent several minutes in the day room with them, talking and changing the TV channel. (*Id.*) Miller attempted to make a phone call, but no one picked up. (*Id.*) Miller was not acting unusual at this time. (SOF ¶¶ 79–80) Harbacek left.

At about 10:11 am, Miller went into her cell alone. She put a female pad up to block the window to her cell. (SOF ¶ 81) This was against jail rules, but it was not visible from the surveillance camera, and the other female detainees did not report it because they assumed that Miller wanted privacy. (SOF ¶¶ 82–83) About 10:40 am, Lewis opened the door to her cell, and saw Miller hanging. (SOF ¶ 84)

The detainees immediately began banging and calling for help. Numerous officers responded within seconds. (SOF ¶ 85) Once the other detainees were secured in cells, Captain Heaton cut Miller down and started CPR, while other officers went for an AED and called an ambulance. (SOF ¶¶ 86–88) Paramedics came and took Miller to a local hospital, but she was brain dead and was taken off life support the following day. (SOF ¶¶ 90–91)

## III. No Vermilion County Employee's Actions Proximately Caused Miller's Death by Suicide.

All section 1983 claims require "but-for" causation and "proximate cause." *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012). Proximate cause boils down to foreseeability and whether some intervening act breaks the chain of liability. *Id.*; *see also Myvett v. Heerdt*, 232 F. Supp. 3d 1005, 1023 (N.D. Ill. 2017). Even if Plaintiff could establish any constitutional violation by Osterbur, Harbacek, or the County, her claims would flounder on causation.

This is so because whatever one concludes about the Vermilion County defendants' *before* Dewey cleared Miller for general population, any argument of objectively unreasonable medical care thereafter flunks the straight face test. As demonstrated above, nothing happened between the 23rd and 27th that warranted any further action: no suicidal statements, no suicidal actions, no requests for help, and no odd behavior or reports of changed circumstances. (SOF ¶¶ 70–75) Even Plaintiff's experts admit this. (*See id.* and sources cited therein). The clincher comes from Miller's roommate Toi Lewis, who testified that Miller was acting "like a normal person" with "no signs" of wanting to harm herself. (SOF ¶ 80)

Plaintiff's experts fault Osterbur for not sending Miller to suicide watch or calling Crosspoint on September 22. While Osterbur's decision was objectively reasonable for the reasons given above, even if one assumes it was not, Miller *was* evaluated the next day and cleared for general population. Osterbur's actions on the 22nd were neither the "but for" nor the "proximate" cause of Miller being in general population on the 27th. Similarly, even if one faults the County for not having a more detailed written policy regarding suicide watch or when a crisis counselor should be called, those alleged deficiencies are irrelevant. Miller *was* given a crisis

evaluation on the 23rd, and the person best equipped to decide whether suicide watch was warranted found that it was not. This evaluation breaks the chain of causation.

Courts have granted summary judgment based on lack of proximate cause in similar cases. In one case, the plaintiff argued that a jail nursing supervisor should have accounted for a detainee's mental health symptoms and history, seen him as a significant suicide risk, and placed him on suicide watch. *Novak v. McIlvain*, 2022 WL 7464096, at *13 (W.D. Wis. Oct. 13, 2022). But "only a few hours" before the detainee's suicide, a mental health professional had determined that the detainee "wasn't suicidal" and "didn't instruct jail staff that Novak was a suicide risk or that he needed special monitoring." *Id.* at *13. The court found that for this reason, nothing the nursing supervisor did, or failed to do, caused the suicide. *Id.* at *14–15.

In another, the plaintiff argued that several correctional officers should have recognized that a detainee was at a high risk of suicide and had him evaluated by a professional soon after booking. *Moriarty v. Cnty. of San Diego*, 2019 WL 1282002, at ** 4–5 (S.D. Cal. Mar. 20, 2019). But the detainee was evaluated days later. The court thus found that whatever the officers "may have done or failed to do on May 25 was not a proximate cause of Moriarty's death on May 31." *Id.* at * 5. So too here. Nothing any County employee did or did not do between September 19th and September 22nd proximately caused Miller's suicide on the 27th.

## IV. IN THE ALTERNATIVE, OSTERBUR AND HARBACEK PREVAIL ON THE GROUNDS OF QUALIFIED IMMUNITY.

The familiar doctrine of qualified immunity shields local officials from liability so long as their conduct does not violate a clearly established right that would be known by a reasonable person. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It applies to mistakes of fact, mistakes of law, or mistakes based on both law and fact. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

"Clearly established" is a phrase of art and requires that "existing precedent must have placed the statutory or constitutional question" confronted "beyond debate." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). Over and over, the Supreme Court has held that a right is "clearly established" only if it has been "defined with specificity" and reversed lower courts (often unanimously) for defining the right at issue at too high a level of generality. *Weiland v. Loomis*, 938 F.3d 917, 919 (7th Cir. 2019) (citing ten such rulings in recent years). *City of Tahlequah v. Bond*, 142 S.Ct. 9 (2021), issued another such unanimous reversal.

Therefore, Plaintiff cannot dodge qualified immunity with generalized statements that it is "clearly established" that detainees have a right to mental health care, or that correctional officers cannot ignore a risk of suicide or even a report that a detainee attempted suicide. Defining the constitutional right at that level is an invitation to reversal. Rather, the issue is whether case law would make it clear to every reasonable officer that, even though a detainee denies suicidal ideation, and even though a mental health professional clears the detainee for general population, the officers must reject the judgment of the medical professional and place the detainee on suicide watch.

The answer is no. Research did not reveal a single Seventh Circuit case dealing with detainee suicide where correctional officers followed the directions of medical or mental health professionals, but lost summary judgment. Recall *McGee*, which held that "our caselaw points decidedly in one direction," that being "in favor of the officers' reasonableness" when they rely on the judgment of medical professionals. *McGee*, 55 F.4th at 572.

To be sure, case law would tell an officer that he or she cannot ignore a detainee's statement that he or she is feeling suicidal, and it would alert an officer to seek advice from a

medical or mental health professional if a detainee's statements or actions showed suicidal ideation.[5] But no case would tell officers that they must override the judgment of a mental health professional and subject a detainee to suicide watch or some other intensive observation even though the expert had cleared the detainee for general population.

Put bluntly, *if* Officer Harbacek had brushed off Miller's September 23, 2020 request to "talk to someone" and Miller had never been seen by Dewey, this would be a different case.[6] *If* Dewey had recommended that Miller be placed on suicide watch, and officers had nevertheless sent her to general population, this would be a different case. *If* between September 23rd and 27th, the officers received new and significant information and did nothing, this would be a different case. But none of those things happened. On these facts, summary judgment is compelled.

## V. Plaintiff Cannot Establish a *Monell* Claim Against the County.

Plaintiff alleges a *Monell* policy-and-practice claim against Vermilion County in Count XI. This claim cannot even leave the starting gate because "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Doxtator v. O'Brien*, 39 F.4th 852, 864 (7th Cir. 2022). This principle applies to "failure to train" claims, which make up the bulk of Plaintiff's *Monell* allegations. *Id.; see also* Compl. Count XI. This has long been the law. *Treece v. Hochstetler*, 213 F.3d 360, 364 (7th Cir. 2000). Thus, if Captain Osterbur and Officer Harbacek are entitled to summary judgment, so is the County.

---

[5] *See, e.g., Pittman* 746 F.3d at 778 (fact question whether officer ignored request to see crisis counselor); *Est. of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017) (liability possible where screening tool used by officer during booking indicated "maximum risk of suicide" but officer "chose to do nothing"); *Sanville* , 266 F.3d at 737 (liability where prisoner allegedly told guards he wanted to commit suicide and that he had written a will, and guards did nothing).

[6] *Novak* noted that if the mental health professional *had* told the nursing supervisor that the detainee was suicidal, and she had done nothing with that information, the case would be very different. *Novak*, 2022 WL 7464096, at *14. But there, as here, "that's not what happened." *Id.*

But even if any individual claims survive, the *Monell* claim must be dismissed. The familiar *Monell* framework permits claims for (1) an official policy adopted by its officers; (2) a decision by an official with final policymaking authority; or (3) a custom or practice that, although not expressly authorized, is widespread and settled. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 678, 690 (1978). Moreover, a *Monell* claim must satisfy a "rigorous causation standard" by proving that "the municipality's action was the 'moving force' behind the federal-rights violation." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021). The causation standard demands a "direct causal link" between the municipal action and the constitutional violation, and courts must "scrupulously appl[y]" it in every case to avoid conflating *Monell* with ordinary *respondent superior*. *Id.*

**A. Plaintiff Cannot Satisfy Any of the *Monell* Theories.**

First, none of the official policies of Vermilion County regarding medical or mental health care are unconstitutional. Plaintiff will likely make much of the fact that at the time of Miller's death, the Jail taught correctional officers to learn and follow the Illinois County Jail Standards as though they were Jail policy rather than adopting its own detailed written policies. (SOF ¶ 23) But the Fourteenth Amendment does not require detailed written policies—no case in this Circuit has ever even suggested that it does. Plaintiff cannot point to any official County policy that is unconstitutional or credibly argue that the County Jail Standards are inadequate.

Second, Plaintiff cannot proceed with a "decision by a person with final policymaking authority" *Monell* claim. Sheriff Hartshorn has final policy making authority for the Jail. (SOF ¶ 7) He was not personally involved with the circumstances of Miller's death. There is no connection between any of his decisions and this incident.

Third, Plaintiff cannot succeed on a "widespread custom or practice" *Monell* theory. The undisputed record shows that in the five years before Miller's death, there were six suicide attempts at the Jail, one of which resulted in a death. (SOF ¶ 13) One death by suicide in the last five years is categorically insufficient for a *widespread* pattern of practice claim. The Seventh Circuit has made clear that "a single incident—or even three incidents—do not suffice" for a Monell claim. *Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014); *see also Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (holding that plaintiff's allegations about his own experience do not establish a policy-or-practice claim).

More to the point, Plaintiff has not even tried to show any similarity between any of the prior incidents and the circumstances of Miller's death. *Monell* liability requires more than mechanically counting bad outcomes. A plaintiff must show a material connection between the events. *Bridges v. Dart*, 950 F.3d 476, 480 (7th Cir. 2020) (holding that fewer than five unconnected incidents over several years insufficient as a matter of law for a *Monell* claim). She has not, so any "pattern or practice" *Monell* claim is doomed.

**B. Plaintiff Cannot Meet the *Monell* Causation Requirement.**

Like her individual claims, Plaintiff's *Monell* claim fails due to lack of causation. To recap from above, Miller was evaluated and cleared for general population by Dewey on September 23, 2023. (SOF ¶ 67) Correctional officers followed Dewey's advice, which the law and commonsense encourages. There were no additional reports of unusual behavior or suicidal ideation thereafter. (*See supra*, Section III) Any allegedly unconstitutional policies and practices which shaped Miller's medical care *before* the evaluation became irrelevant after the evaluation.

Put differently, Plaintiff cannot establish a *Monell* claim merely by pointing to some unconstitutional policy or practice by the County. Rather, she must show: 1) the policy or practice was both unconstitutional; and 2) it was the "moving force" for why County employees acted as they did *between the time of Dewey's evaluation and Miller's death*. This she cannot do.

## VI. THE STATE LAW CLAIMS RISE OR FALL WITH THE FEDERAL CLAIMS.

Plaintiff also alleges state law claims for "willful and wanton" conduct against the Vermilion County Defendants. (Compl. Counts I, II, V, VI) These claims rise or fall with her federal constitutional claims because, as the Seventh Circuit has long recognized, the "willful and wanton" standard and the Eighth Amendment "deliberate indifference" standard are so similar they are interchangeable. *Chapman v. Keltner*, 241 F.3d 842, 847 (7th Cir. 2001). The Vermilion County defendants provided "objectively reasonable" medical care for the reasons stated above, so by definition they did not act with deliberate indifference or in a willful and wanton manner. The state law claims should be dismissed on summary judgment.

## VII. THE SEVENTH CIRCUIT'S "OBJECTIVE REASONABLENESS" STANDARD FOR A PRETRIAL DETAINEE'S DENIAL OF MEDICAL CARE CLAIM SHOULD BE OVERRULED.

The federal courts of appeal do not agree whether the "objective reasonableness" standard in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), should apply to denial of medical care claims by pretrial detainees. *Cf. Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023) (answering yes, and citing cases from the Second, Sixth, Seventh, and Ninth Circuits which did the same) *with Strain v. Regalado*, 977 F.3d 984, 990 (10th Cir. 2020) (answering no, continuing to apply the "deliberate indifference" test, and citing cases from the Fifth, Eighth, and Eleventh circuits which did the same).

The Vermilion County Defendants understand that this Court must follow published Seventh Circuit precedent. They have therefore argued this motion under the "objective reasonableness" standard. More to the point, they are entitled to summary judgment regardless of whether the standard is objective reasonableness or deliberate indifference. But they respectfully submit that the Seventh Circuit stands on the wrong side of this circuit split, and its precedent should be overruled for the reasons given in *Strain*. They are raising this point briefly to preserve this issue for appeal.

**CONCLUSION**

The Seventh Circuit has never allowed a jail suicide claim to go forward where, as here, the correctional officer directly asked the detainee about suicidal ideation and was given a negative response, and the officers thereafter had the detainee evaluated by a mental health professional, who cleared the detainee for general population. Indeed, either of those facts alone would warrant summary judgment. *See, e.g.*, *Berry*, 604 F.3d at 440 (reiterating that lay officers may follow the advice of medical professionals without fear of liability); *Matos*, 335 F.3d at 557 (holding that even if a correctional officer "should have known not to take 'no' for an answer" when querying a detainee about suicide, that only amounts to negligence, which is insufficient to state a constitutional claim). Together, they erase any doubt that the Vermilion County Defendants should prevail on the merits, and in the alternative on qualified immunity.

For these and the above reasons, the Vermilion County Defendants respectfully ask this Court to grant their motion for summary judgment.

Respectfully submitted,

/s/ **G. David Mathues**
MICHAEL W. CONDON, # 06192071
G. DAVID MATHUES, # 06293314
*Attorneys for Vermilion County Defendants*
HERVAS, CONDON & BERSANI, P.C.
333 Pierce Road, Suite 195
Itasca, IL 60143-3156
P: 630-773-4774 F: 630-773-4851
mcondon@hcbattorneys.com
dmathues@hcbattorneys.com

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| DEEA MILLER, Individually and as Independent Administrator of the Estate of KACEY MILLER, Deceased, | ) | |
| Plaintiff, | ) | Case No. 22-cv-2029 |
| vs. | ) | Judge Colleen R. Lawless |
| VERMILION COUNTY SHERIFF'S OFFICE, ET AL. | ) | Magistrate Judge Karen L. McNaught |
| Defendants. | ) | |

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)(4), (D)(5)**

The undersigned counsel for Defendants Vermilion County does hereby certify that according to the Microsoft Word program, the "Argument" Section of the Vermilion County Defendants' Motion for Summary Judgment is 5,284 words (including footnotes), which is below the limit of 7,000 words established by the Local Rules.

Dated: May 30, 2024

Respectfully submitted,

/s/ **G. David Mathues**

MICHAEL W. CONDON, # 06192071
G. DAVID MATHUES, # 06293314
*Attorneys for Vermilion County Defendants*
HERVAS, CONDON & BERSANI, P.C.
333 Pierce Road, Suite 195
Itasca, IL 60143-3156
P: 630-773-4774 F: 630-773-4851
mcondon@hcbattorneys.com
dmathues@hcbattorneys.com

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| DEEA MILLER, Individually and as Independent Administrator of the Estate of KACEY MILLER, Deceased, | ) | |
| Plaintiff, | ) | Case No. 22-cv-2029 |
| vs. | ) | Judge Colleen R. Lawless |
| VERMILION COUNTY SHERIFF'S OFFICE, ET AL. | ) | Magistrate Judge Karen L. McNaught |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on **May 30, 2024**, I electronically filed the foregoing ***Defendants Vermilion County Motion for Summary Judgment*** with the Clerk of the District Court for the Central District of Illinois, Urbana Division, using the CM/ECF system, which will send notification to the following CM/ECF participants:

**TO:**

Bhavani K. Raveendran
Sam A. Harton
Javier Rodriguez, Jr.
Romanucci & Blandin, LLC
321 N. Clark St., Ste. 900
Chicago, IL 60654
braveendran@rblaw.net
sharton@rblaw.net
jrodriguez@rblaw.net

Brent L. Salsbury
C. Zachary Vaughn
Wiedner & McAuliffe, Ltd.
101 S. Hanley, Suite 1450
St. Louis, MO 63105
blsalsbury@wmlaw.com
czvaughn@wmlaw.com

Respectfully submitted,

/s/ **G. David Mathues**
MICHAEL W. CONDON, # 06192071
G. DAVID MATHUES, # 06293314
*Attorneys for Vermilion County Defendants*
HERVAS, CONDON & BERSANI, P.C.
333 Pierce Road, Suite 195
Itasca, IL 60143-3156
P: 630-773-4774 F: 630-773-4851
mcondon@hcbattorneys.com
dmathues@hcbattorneys.com