E-FILED
Monday, 09 September, 2024
Clerk, U.S. District Court, ILCD



**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| **DEEA MILLER, Individually and as Independent Administrator of the Estate of KACEY MILLER, Deceased,** | ) | |
| **Plaintiff,** | ) | **Case No.: 2:22-cv-02029-CRL-KLM** |
| **-vs-** | ) | |
| **VERMILION COUNTY SHERIFF'S OFFICE, et al.,** | ) | **Judge Colleen R. Lawless** **Magistrate Judge Karen L. McNaught** |
| **Defendants.** | ) | |

---

Now Comes Plaintiff Responding to Vermilion County Defendants' Motion for Summary Judgment. In support thereof, Plaintiff states as follows:

## I. <u>Introduction</u>

After being admitted to the Vermilion County jail on September 19, 2020, Kacey Miller attempted suicide twice. Upon learning of these attempts on September 22, 2020, Defendants Osterbur and Harbacek did not refer Kacey to a mental health professional or place her on suicide watch immediately. The next day, Kacey asked to "talk to someone," at which time they took steps to summon a mental health professional. Unfortunately, though, the Vermilion County Jail has no suicide prevention policy and instead fosters a custom of near-complete lack of communication amongst jail staff and mental health professionals, permitting both staff and contracted professionals to conduct inadequate, uninformed, and cursory suicide assessments. Defendants Harbacek and Osterbur failed to make any effort to ensure anyone else, including the mental health professional, knew that she had attempted suicide twice in the prior two day, so, the mental health provider evaluating Kacey was missing material information regarding her suicidal intent, and he did not

implement any suicide precautions. Kacey committed suicide on September 27, 2020, by hanging herself with a bed sheet in a cell at the Vermilion County Jail—as she had attempted to do two times earlier that week. Plaintiff brings constitutional and state claims against Defendants Harbacek, Osterbur, and Vermilion County.

## II. Defendant's Facts and Plaintiff's Responses

### A. Undisputed material facts

1. Plaintiff's decedent Kacey Miller ("Miller") was at all relevant times a resident of Vermilion County, Illinois, and Plaintiff Deea Miller ("Plaintiff") is Kacey's mother and the administrator of her estate.

Response: Undisputed.

2. Defendant Vermilion County was at all relevant times a municipal corporation operating under the laws of Illinois.

Response: Undisputed.

3. Defendant Colin Osterbur was at all relevant times an employee of the Vermilion County Sheriff's Office, holding the rank of "Captain," in charge of day-to-day operations at the Jail, and reporting directly to the Sheriff.

Response: Undisputed.

4. Defendant Barbara Harbacek was at all relevant times an employee of the Vermilion County Sheriff's Office, and in September 2020 was still in her initial 90-day probationary training period.

Response: Undisputed.

5. Defendant Crosspoint Human Services ("Crosspoint") is a community mental health organization located in the County and the recipient of a grant from the State of Illinois to provide crisis evaluations throughout the County, including but not limited to the Jail.

Response: Undisputed.

6. Defendant James Andrew Dewey was at all relevant times a mental health professional and crisis counselor employed by Crosspoint.

Response: Undisputed.

7. Patrick Hartshorn has been the elected sheriff of Vermilion County since 1990. Sheriff Hartshorn is, per Illinois statute, ultimately responsible for overseeing the Jail, but delegates much of the day-to-day management of the Jail to the Jail Captain, who reports directly to Hartshorn.

Response: Undisputed.

11. The Jail employs a Nurse Practitioner, Steve Skimehorn. He has experience seeing psychiatric patients and comes to the Jail once a week and is able to prescribe mediations for mental health conditions.

Response: Undisputed.

14. The Jail relies on Crosspoint's qualified mental health professionals to perform a crisis evaluation on detainees who may be experiencing suicidal ideation.

Response: Undisputed.

16. The correctional officers and medical staff at the Jail always follow the Crosspoint mental health professional's housing recommendation regarding whether the detainee should be placed or kept on suicide watch or returned to general population.

Response: Undisputed.

17. When a detainee is placed on suicide watch, the detainee is, among other things, put into a padded cell with no furniture, is given a "suicide smock" to wear, is denied any personal items, and is checked every 15 minutes. These protocols are designed to severely reduce the ability of a detainee to engage in suicide or self-harm.

Response: Undisputed.

20. Correctional officers also attend an annual refresher course on suicide prevention, which is a series of videos put out by the Illinois Department of Corrections.

Response: Undisputed, clarify that Correctional officers watch the same two videos as their refresher course on suicide prevention.

24. At all relevant times, the Jail's procedure regarding suicide prevention includes asking questions related to prior mental health treatment and suicidal ideation during booking, and, if the detainee answered yes, having medical or mental health professionals follow up.

Response: Undisputed, although Plaintiff clarifies that there was no formal, written suicide-prevention policy at the Vermilion County Jail.

25. At all relevant times, the Jail's custom and practice is that any correctional officer can direct that a detainee be sent to suicide watch if the detainee by "statement or action" causes the Jail employee to fear that the detainee is at an imminent risk of self-harm such that officers "need to be observing them more frequently."

Response: Undisputed.

26. Once a detainee is sent to suicide watch, the Jail will ask Crosspoint for a mental health professional to evaluate the detainee's mental state and determine if the detainee can be safely returned to the general population.

Response: Undisputed.

32. While the Jail prohibits detainees from bringing any item of clothing into the jail, Miller smuggled a belt past booking and into the Jail.

Response: Undisputed.

33. Miller was initially housed in a dormitory room known as "3-Dorm" with several other female detainees as part of then-existing COVID protocols.

Response: Undisputed.

34. Harbacek was hired as a correctional officer on July 13, 2020, and did not interact with Miller until September 22, 2020.

Response: Undisputed.

35. While Osterbur knew of Miller before September 2020 because Miller had been detained at the Jail before, he was not aware of any specific information regarding her mental health conditions or prior suicide attempts.

Response: Undisputed.

36. Around 1:45 pm on September 21, Miller attempted to hang herself in the shower of 3-Dorm using the smuggled belt, but she fell in the process and did not succeed.

Response: Undisputed.

41. Nurse Harding was familiar with Miller from Miller's prior detentions, had treated her between five and seven times, and had a good rapport with Miller.

Response: Undisputed.

42. Nurse Harding had given Miller a 3-day protocol of heroin withdraw medications on prior occasions, and on September 22, 2020, prescribed the same 3-day protocol as before.

Response: Undisputed.

38. Miller had been diagnosed with both mental health and substance abuse disorders, a dual diagnosis shared by around 30 percent of detainees in the United States.

Response: Undisputed.

39. On September 21, 2020, Miller requested medical care through the Jail's kiosk for heroin withdrawal symptoms.

Response: Undisputed.

40. On September 22, 2020, Officer Harbacek escorted Miller to Nurse Harding pursuant to Miller's request the date before, and at the same time escorted Miller's cellmate Toi Lewis to be seen for an injured eye.

Response: Undisputed.

43. At some point during this medical visit, Miller's cellmate Toi Lewis told Harbacek that Miller had smuggled a belt into the Jail, and that the day before (the 21st), Miller had attempted to hang herself in 3-Dorm.

Response: Undisputed.

44. Lewis's statement was the first time any Jail employee was told that Miller attempted suicide or self-harm in September 2020.

Response: Undisputed.

46. Nurse Harding also learned of Lewis' report. Nurse Harding asked Miller if she was suicidal, and Miller said no, and also told Harding that if she (Miller) was going to kill herself, she would tell Harding.

Response: Undisputed.

47. Miller also told Harding that Miller only smuggled in the belt to see if she could evade detection. Miller did not appear sad or upset.

Response: Undisputed.

48. Osterbur met with Miller in the Jail's attorney room. Osterbur asked Miller if she had attempted suicide or had thoughts of suicide.

Response: Undisputed.

49. Miller told Osterbur she had not attempted suicide and did not have suicidal thoughts.

Response: Undisputed.

50. Osterbur did not see any marks on Miller's neck or other physical indications that Miller had tried to hang herself.

Response: Undisputed.

51. Osterbur told Miller that if her mental state changed, she should tell officers or a nurse that she wanted to talk to someone, and the Jail would facilitate that request.

Response: Undisputed.

53. The next morning, the 23rd, Miller told Officer Harbacek that she wanted to talk to someone but did not say why. Miller appeared "a little bit more sad" but was not crying. Harbacek inferred that the request related to the prior day's events.

Response: Undisputed.

55. Crosspoint counselor Dewey met with Miller that morning between 10:55 am and 11:32 am and performed a crisis assessment.

Response: Plaintiff does not dispute this factual statement, but clarifies "that morning" is referring to September 23, 2020.

56. Dewey conducted the assessment in the Jail's visiting room, separated from Miller by glass, but was able to see all of her body language.

Response: Plaintiff admits that Dewey conducted the assessment with Ms. Miller while separated by glass. Plaintiff admits that Dewey testified that he could see her body language.

57. Jail staff gave Dewey as much time as he needed, and no one from the Jail pressured or influenced Dewey on how to conduct that assessment.

Response: Undisputed.

58. At the time he performed the assessment of Miller, Dewey was a Qualified Mental Health Professional with a master's degree in psychology, had performed several hundred crisis

assessments for suicidal ideation, and had received classroom and on-the-job training in the field of mental health.

Response: Undisputed, but Plaintiff clarifies he did not have any mental health licensures. ECF 133-5, Dewey Deposition at 157-158.

64. As a matter of regular practice, Dewey would not tell a correctional officer if he believed a detainee was at a "moderate" risk and he did not do that with Miller.

Response: Undisputed.

65. Consistent with his regular practice upon completing a crisis assessment, once Dewey finished, he notified Sgt. Kevin Maskel over the intercom that Miller was clear to be returned to general population.

Response: Undisputed.

66. After finishing the assessment, Dewey told Nurse Harding, "I'm done with her, I think she's fine" and that he was recommending Miller go back to general population. Harding responded, "Ok" or "good."

Response: Undisputed.

67. Even though Dewey's notes state that he "consulted" with Maskel and Harding, Dewey did not solicit input from either of them regarding Miller's housing. By "consulted," Dewey meant that he told Maskel and Harding about the decision he reached.

Response: Undisputed.

68. Dewey's recommendation was followed, and Miller was returned to general population.

Response: Undisputed.

69. Whenever a Crosspoint counselor conducted a crisis evaluation on a detainee and recommended either that the detainee be sent to or remain on suicide watch, or, on the other hand, that the detainee was cleared for general population, the Jail always followed that recommendation.

Response: Undisputed.

70. From the time Dewey cleared Miller for general population on September 23, and the time Miller entered her cell to take her life on September 27, Miller did not tell any correctional officer or other County employee that Miller was feeling suicidal.

Response: Undisputed.

71. From the time Dewey cleared Miller for general population on September 23 to the time Miller entered her cell to take her life on September 27, no other detainee reported to any correctional officer that Miller had made a suicidal statement.

Response: Undisputed.

72. From the time Dewey cleared Miller for general population on September 23 to the time Miller entered her cell to take her life on September 27, Miller did not request any medical care or any mental health services, either through the kiosk system or directly to any correctional officer.

Response: Undisputed.

73. From the time Dewey cleared Miller for general population on September 23 to the time Miller entered her cell to take her life on September 27, no other detainee reported to any correctional officer that Miller attempted suicide or self-harm.

Response: Undisputed.

74. From the time Dewey cleared Miller for general population on September 23 to the time Miller entered her cell to take her life on September 27, no other detainee reported to any correctional officer that Miller's mood or attitude underwent a significant change.

Response: Undisputed.

76. Harbacek did not interact with or learn anything new about Miller between September 24 and 26.

Response: Undisputed.

77. Captain Osterbur did not receive any new information about Miller or hear about Miller requesting services or making statements between September 23 and 27 and he was not working on September 27th.

Response: Undisputed.

78. Around 10:00 am on September 27, Harbacek went into A-Block and let Miller and four other detainees out of their cells for free time. Harbacek stayed about three minutes, and during that time, Harbacek talked to the female detainees, changed the channel on the TV at their request, and saw Miller attempt to make a phone call that was not completed because the intended recipient did not pick up.

Response: Undisputed.

79. Harbacek observed Miller acting normally. The window to Miller's cell was not blocked at this time

Response: Undisputed.

80. Miller was acting "like a normal person" on the morning of September 27, not "different at all."

Response: Undisputed.

81. Miller entered her cell at 10:11 am, shut the door, and put a female pad over the cell door to block the view to the inside.

Response: Undisputed.

82. The other female detainees saw that Miller had blocked the window to her cell, and knew this was against the rules, but did not report it because they thought she just wanted privacy.

Response: Undisputed.

83. The monitoring video which the correctional officers used to observe A-Block showed Miller entering her cell alone at 10:11 am, but it does not show her blocking the window, because it is not possible from the video to see if a cell window is being covered from the inside.

Response: Undisputed.

84. At about 10:39 am, one of the other detainees opened the door to Miller's cell and saw her hanging. The female detainees started banging and calling for officers.

Response: Undisputed.

**B. Disputed Material Facts**

13. In the five years before Kacey Miller's death in the Jail, there were six suicide attempts at the Jail, one of which resulted in a death.

Response: Undisputed. Plaintiff admits that Sergeant Heaton testified he did "not have an exact number" but he "believe[s] there was six total" based on documentation he received from the state. ECF 33-9, Heaton Deposition at 91.

15. When called, the Crosspoint mental health professional will conduct a crisis evaluation and then make a clinical judgment whether the detainee should remain in (or be placed in) a padded cell on suicide watch or can return to general population.

Response: Plaintiff disputes that Crosspoint professional's evaluations culminate in a "clinical judgment." Plaintiff does not dispute that Crosspoint professionals decide whether to return an individual to general population or suicide watch.

18. On certain occasions, detainees may make a threat of suicide, or report that another detainee was suicidal, for strategic rather than medical reasons, and the correctional officers were aware of the possibility.

Response: Disputed. While witnesses have referenced this abstract proposition, there is no evidence in the record that such instance actually occurred at the Vermilion County Jail. Indeed,

Captain Osterbur testified he could not recall any specific incident of an inmate falsifying an attempted suicide. ECF 3-2, Osterbur Deposition at 105. Plaintiff also disputes any implication that Defendants had any reason to believe or assume Kacey Miller or her cellmate were strategically fabricating her suicide risk. Additionally, the report of Kacey's suicide attempt, even though it was reported by a fellow detainee, "should be responded to with seriousness and with the assumption that it's valid information." Ex. 1, Sinner Deposition at 45:12-26:20. Additionally, had Defendants reviewed the video footage of 3-Dorm, they would have confirmed that something unusual and alarming occurred in the shower area involving Ms. Miller on September 21, 2020, at approximately 1:43 p.m.

19. Jail correctional officers receive initial training on detainee mental health and suicide prevention as part of their training at the academy.

Response: Disputed. The cited portions of Sergeant Heaton's deposition indicate that the jail correctional officers for Vermilion County are trained to refer people with mental health issues or needs to mental health professionals. The cited portions of the deposition do not provide a basis to conclude that Vermilion County officers received initial mental health or suicide prevention training beyond the need to refer people with mental health needs to a mental health professional. Plaintiff's correctional expert will testify to the deficiencies of Vermilion County's training efforts. See Ex. 2, Sinner Report at 10-11.

21. Correctional officers received additional on-the-job training through experience, first through a formal 90-day program where they work beside more experienced officers, and then less formally through continued observation and experience.

Response: Plaintiff admits that correctional officers received on-the-job "training" at Vermilion County but there is no evidence in the record or in these cited portions of discovery to

support the notion that this was a "formal" training process. The 90-day program was also an informal, on-the-job training. ECF 33-9, Heaton Deposition at 15-20:9.

23. At all relevant times, the County's policy was that correctional officers should know and comply with the Illinois County Jail Standards, which give more details on some topics, including suicide prevention, than the Jail's policy manual.

Response: Disputed. The County Jail Standards specifically require jail administrators to establish a "written manual of policies and regulations for the operation of the jail" that includes "written procedures for […] medical emergencies including suicide prevention and crisis intervention," Ex. 3, Illinois County Jail Standards at 701.10(b), but Vermilion County had no suicide prevention policy at the time of Kacey's death. See Pl.'s Fact 1, *infra.* The proposition that correctional officers were expected to adhere to Illinois County Jail Standards as a matter of Vermilion County policy is undermined by Vermilion County's failure to adhere to the Standards' requirements regarding suicide prevention itself. Id.

27. Vermilion County does not train Crosspoint counselors on how to assess persons in crisis or what steps to take if a person is in crisis, because the counselors get that training from Crosspoint and "know what to do."

Response: Plaintiff does not dispute that Crosspoint counselors are not trained. Plaintiff disputes that Crosspoint counselor's "know what to do" when evaluating detainees, as evidenced by Defendant Dewey's deviation from national standards. See Pl.'s Additional Facts, *infra*, ¶¶ 82-88.

28. Vermilion County does not train Crosspoint counselors how to determine if a person is in crisis, and Jail personnel are not qualified to train Crosspoint mental health professionals on that topic.

Response: Disputed. Vermilion County contracts with Crosspoint so that Crosspoint provides mental healthcare, and Vermilion County officials are qualified to provide training on how

such mental health services are to be implemented throughout the jail. See Pl.'s Additional Facts, *infra*, ¶¶ 12, 15, 18, 49-51, 54-57. Plaintiff does not dispute that Vermilion County does not provide training to Crosspoint.

29. If a mental health professional makes a recommendation regarding detainee housing, specifically whether the detainee needs to be on suicide watch or can be returned to general population, it is proper procedure for correctional officers to follow that mental health professional's recommendation.

Response: Plaintiff does not dispute that in situations involving potentially suicidal inmates, correctional staff should generally defer to the expertise of mental health professionals who are conducting adequate evaluations. Plaintiff disputes that it was "proper procedure" for Vermilion County correctional officers to follow mental health recommendations by Crosspoint employees given Vermilion County's knowledge of the deficiencies that existed in their mental health evaluation protocol and Vermillion County agents' failure to provide Crosspoint employees with information regarding the suicide attempt by Kacey Miller. See Pl.'s Additional Facts, *infra*, ¶¶ 60-65.

37. This incident caused some noise in 3-Dorm, and a female correctional officer responded. But Miller told the other female detainees not to report the suicide attempt, and the other detainees agreed, and they falsely told officers responding to the noise that nothing significant happened.

Response: Disputed. Ms. Lewis reported Kacey's two suicide attempts to Defendant Harbacek. ECF 33-12, Lewis Deposition at 19:12-25, 22:20-22, 53:3-18, 106:9-13; See also ECF 33-3, Harbacek Deposition at 101:20-24 (acknowledging that Lewis told her Kacey tried to hang herself).

45. After hearing this report, Officer Harbacek took Lewis back to the cell she shared with Miller, and, with Lewis' help, confiscated the belt. Harbacek then told Captain Osterbur what Lewis had reported

Response: Disputed. Officer Harbacek did not participate in the confiscation of the belt. Rather, she had Ms. Lewis retrieve it without searching or ordering a search of Kacey's cell. ECF 33-12, Lewis Deposition at 53:3-24; ECF 33-3, Harbacek Deposition at 108:9-110:4.

52. Osterbur decided that Miller was not an imminent suicide risk and allowed her to return to general population rather than placing her on suicide watch.

Response: Osterbur was aware that Miller's recent suicide attempt was a significant indicator of suicide. ECF 33-2 at 46:19-47:2, 53:17-54:3, 66:3-9. He also determined that she was a suicide risk the next day when she requested to talk to someone. ECF 33-2, Osterbur Deposition at 87:23-88:3. Whether or not he was aware of her suicide risk is, at least, a question for the jury (discussed *supra*). Plaintiff does not dispute that he opted to release her to general population instead of placing her on suicide watch.

54. Officer Harbacek relayed Miller's request to Captain Osterbur and Nurse Harding. One of them called Crosspoint and asked for a mental health professional to assess Miller for "suicidal ideation."

Response: Plaintiff disputes this statement to the extent it implies that anyone at Crosspoint knew of Kacey's suicide attempts or intent. See ECF 33-5, Dewey Deposition at 176:17-21; ECF 33-2, Osterbur Deposition at 49:2-15 (testifying it was not the standard at Vermilion to provide reports of suicide attempts to Crosspoint).

59. Dewey did not ask Harbacek, Osterbur, Harding, or any other Jail employee for details on Miller's background or conduct while in the Jail because Dewey's "professional judgment" was that it was "best" not to seek such "hearsay" information from third parties so that "someone else's opinion" did not cloud his own assessment.

Response: Plaintiff admits that this statement accurately reflects the testimony, but disputes that it reflects a constitutionally adequate procedure of assessing suicide or that it reflects

appropriate professional judgment of a mental health professional. See Pl.'s Additional Facts, *infra*, ¶¶ 60-65, 69, 73-79, 82-88.

60. No one from the Jail concealed information about Miller from Dewey or provided him with false information about Miller.

Response: Disputed. Defendant Osterbur, Defendant Harbacek, and Nurse Harding failed to inform Crosspoint of pertinent information—Kacey's recent suicide attempts and acute suicide risk—from Crosspoint and Mr. Dewey. See Pl.'s Additional Facts, *infra*, ¶¶ 46-47, 49-53, 105.

61. No one from the Jail would have had reason to know if Dewey's crisis assessment of Miller fell below the standard of care.

Response: Plaintiff disputes this fact. Defendants include correctional professionals and a municipality responsible for maintaining a correctional facility. Defendants knew that one of the most important things to know when evaluating suicide is whether that person recently attempted suicide, yet Defendants concealed that information from Mr. Dewey prior to his assessment. See Pl.'s Additional Facts, *infra*, 54-57. Defendants knew that Mr. Dewey was missing crucial information regarding Ms. Miller's suicide risk prior to his assessment and thus had reason to know his crisis assessment was deficient. See Pl.'s Additional Facts, *infra*, 49, 53, 64, 105.

62. After completing his assessment, Dewey made the clinical judgment that Miller was at a "moderate" risk of harm to self with the ability to "safety plan" and was not at a high or immediate risk of suicide.

Response: Plaintiff admits that Dewey determined Ms. Miller was a moderate risk of harm to self with the ability to safety plan and was not a high or immediate risk of suicide, but denies any implication that this decision was rendered according to an adequate assessment or "clinical judgment" given the deficiencies in Dewey's knowledge. See Pl.'s Additional Facts, *infra*, ¶¶ 60, 64-65, 69, 82-88.

63. In Dewey's mind, a "moderate" risk of self-harm means there is a moderate risk that sometime in the future the person might try and self-harm in some way, not necessarily suicidal harm, and who has some suicidal risk factors but no intent or plan and is not in crisis.

Response: Plaintiff admits that this is an accurate description of what Dewey described the meaning of "moderate risk of harm to self with the ability to safety plan" to mean. Plaintiff denies any implication that Kacey was not an acute suicide risk who had demonstrated intent or a plan. See Pl.'s Additional Facts, *infra*, ¶¶ 19-27, 59, 61, 63, 70.

**C. Undisputed Immaterial Facts**

8. In September 2020, the country was still suffering from the COVID 19 pandemic, which created additional challenges for jail administrators by consuming time, attention, resources, and requiring procedural changes.

Response: Undisputed. The fact that COVID-19 was occurring has no impact on the constitutional standards regarding suicide prevention.

9. In September 2020, detainees at the Jail could request medical care or mental health care by sending a request through an electronic kiosk, which was located in each cell block. These requests would be reviewed each day by RN Shelly Harding and then triaged before being addressed.

Response: Undisputed. Whether Kacey had access to the kiosk is not at issue.

10. Detainees could also directly ask officers for medical or mental health care, and when that happened, the officer would either tell the detainee to make a request through the kiosk or the officer would relay the request to the Jail captain or nurse.

Response: Undisputed. Whether Kacey had access to the kiosk or officers is not at issue.

12. The Jail does not employ a psychiatrist because there is only one psychiatrist in Vermilion County, and the Jail cannot afford him.

Response: Undisputed. Vermilion County's financial constraints are not relevant to their constitutional obligations.

22. The Jail is inspected every year by personnel from the Illinois Department of Corrections. It passed every year between 2017 and 2020.

Response: Undisputed. Vermilion County's inspection by state entities is not relevant to their constitutional compliance.

30. Kacey Miller was booked into the Vermilion County Jail shortly after 4 pm on Sunday, September 19, 2020, and, as part of that process, the booking officer observed her behavior and asked screening questions.

Response: Undisputed. Although, Plaintiff notes that Sergeant Heaton deposition does not support this proposition and Defendant has not attached the reference questionnaire as Exhibit L. Further, Plaintiff has not asserted a theory that any Defendant should be held liable for the failure to initially screen Ms. Miller for suicide risk at the time that she first entered the jail. These facts are not material to whether Defendants appropriately responded to learning of her acute suicide risk on September 22, 2023, and September 23, 2023, or whether Vermilion County had an unconstitutional policy regarding their responses to known suicide risks.

31. At booking, Miller showed no unusual behavior, such as making threats of suicide, exhibiting extreme depression, or acting withdrawn, and she answered "no" when asked if she had previously been treated for mental health problems or was taking medication for such problems.

Response: Undisputed. Plaintiff has not asserted a theory regarding the failure to initially screen Ms. Miller for suicide risk at the time that she first entered the jail. These facts are not material to whether Defendants appropriately responded to learning of her acute suicide risk on September 22, 2023, and September 23, 2023, or whether Vermilion County had an unconstitutional policy regarding their responses to known suicide risks.

75. Miller's own cellmate did not see "any signs of Kacey [Miller] wanting to harm herself" after the time the belt was removed from her cell.

Response: Undisputed. It is not a material fact as Ms. Lewis is not trained in suicide prevention or any other mental health capacity, and her assessment of Ms. Miller's mental health or suicidal intention is irrelevant.

85. Within seconds, several correctional officers, including Harbacek, Officer Tracy Acord, and Dylan Vice came running to A-Block.

Response: Undisputed, but this fact is immaterial because Defendants' response subsequent to Ms. Miller's suicide is not at issue.

86. Officers Harbacek and Acord began getting the other female detainees back into cells in order to secure the area and eliminate any risk of escape or harm to the officers attending to Miller.

Response: Undisputed, but this fact is immaterial because Defendants' response subsequent to Ms. Miller's suicide is not at issue.

87. Captain Heaton was the shift commander. He came to A-block from another part of the third floor in response to a radio call for help, initially believing that there was a fight.

Response: Undisputed, but this fact is immaterial because Defendants' response subsequent to Ms. Miller's suicide is not at issue.

88. When Heaton entered A-Block, there was a lot of commotion and Officer Vice told Heaton that Miller was hanging from the vent in her cell. Heaton cut Miller down with a pocketknife he had on his person, while Officer Vice supported Miller.

Response: Undisputed, but this fact is immaterial because Defendants' response subsequent to Ms. Miller's suicide is not at issue.

89. Captain Heaton started CPR on Miller, and about the same time, he called out for someone to get the AED and make sure that an ambulance had been called.

Response: This fact is immaterial because Defendants' response subsequent to Ms. Miller's suicide is not at issue.

90. Paramedics arrived approximately ten minutes after the first correctional officers entered A-Block, began emergency treatment, and transported Miller to a local hospital.

Response: Undisputed, but this fact is immaterial because Defendants' response subsequent to Ms. Miller's suicide is not at issue.

91. Miller never regained consciousness and was taken off life support the following day, September 28, 2020, due to complete lack of brain activity and was pronounced dead.

Response: Undisputed, but this fact is immaterial because Defendants' response subsequent to Ms. Miller's suicide is not at issue.

92. The Jail requested the Illinois State Police to conduct the investigation into Miller's death to avoid a conflict of interest and they did.

Response: Undisputed, but this fact is immaterial because Defendants' response subsequent to Ms. Miller's suicide is not at issue.

93. The State Police gave their completed investigation file to the Vermilion County State's Attorney, who determined that no criminal charges were warranted.

Response: Undisputed, but this fact is immaterial because Defendants' response subsequent to Ms. Miller's suicide is not at issue.

## III. <u>Plaintiff's Additional Material Facts</u>

1. Vermilion County did not have a written suicide prevention policy at the time of Kacey's death. ECF 33-2, Osterbur Dep. at 26:9-18, 29:5-10; ECF 33-9, Heaton Deposition at 30:18-23, 71:6-72:21, 74:21-75:5, ECF 33-6, Hartshorn Deposition at 50:9-51:8.
2. The only suicide prevention training offered at Vermilion County Jail was entry-level suicide training at the State Academy, the same video presented every year by the state, and on-the-job,

as-you-go training. ECF 33-2, Osterbur Deposition at 55:8-16, 56:9-15, 57:16-23, 62:5-16, 113:6-23; Harbacek Deposition at 78:12-14.

3. The video training, provided by the State of Illinois, told participants to refer to their facility's policy and administrators regarding suicide prevention. Ex. 4, Video part 4 at 6:44-6:57, 8:17.
4. During the suicide prevention training video, the presenter rolled her eyes and stated "the person who wrote that is a little overzealous" when referring to the Powerpoint slide regarding liability. Id. at 7:20-7:26.
5. If a detainee is placed in the padded cell, they typically remain there on suicide watch for 72 hours. ECF 33-12, Lewis Deposition at 54:3-11.
6. Inmates placed on suicide watch were not permitted to be released back to general population until a Crosspoint counselor cleared them. ECF 33-3, Harbacek Deposition at 81:7-15; ECF 33-9, Heaton Deposition at 183:11-184:11.
7. Officers typically learn that there is something wrong in a housing unit because detainees "banged on the door or spoke loudly." ECF 33-3, Harbacek Deposition at 24:1-23.
8. Osterbur was promoted to lieutenant in 2016, then promoted to captain in 2018. ECF 33-2, Osterbur Deposition at 11:23-12:13. Osterbur testified to a woman who successfully hung herself with a phone cord during his tenure as either a lieutenant or captain. Osterbur Deposition at 35:12-36:19.
9. In November of 2019, Sergeant Heaton, Vermilion's 30(b)(6), witness responded to a woman whose face was blue after she attempted to hang herself with a bra. Ex. 5, Incident Reports.
10. Vermilion County had at least eight attempted suicides at the jail between September 2020 and August of 2022. Id.
11. It was not the procedure for jail personnel to provide information regarding an inmate to Crosspoint personnel prior to a Crosspoint counselor conducting a crisis assessment. ECF 33-5,

Dewey Deposition at 63:7-15, 109:10-12, 143:5-15, 175:7-24; ECF 33-2, Osterbur Deposition at 49:2-15.

12. Vermilion County's 30(b)(6) witness testified that command officers are responsible for calling Crosspoint's crisis line to "give them the information that [they] have on the situation." ECF 33-9, Heaton Deposition at 101:1-11.

13. Vermilion County had experienced an increase in detainees who make suicidal statements or attempts, engage in self-harm, and were on mental health medication in the preceding fifteen years. ECF 33-9, Heaton Deposition at 111.

14. Vermilion County had been considering adding a more specific policy on suicide prevention since "late 2019 and early 2020" because we were seeing many more people come into the jail with psychological problems." ECF 33-6, Hartshorn Deposition at 69:7-72:6.

15. Vermilion County implemented a formal, written suicide prevention policy after Kacey killed herself. ECF 33-9, Heaton Deposition at 13:1-14, 31:19-32:23.

16. In the two years following Kacey's death, Vermilion County jail has recorded eight incidents involving suicide attempts or self-harm, including one completed suicide. Ex. 6, Completed Suicide Report; Ex. 5, Suicide Incident Reports. One of the suicide attempts involved a woman hanging herself from the showerhead. Ex. 5, Suicide Incident Reports.

17. Other than implementing a formal policy, Vermilion County has not made any changes to its suicide prevention training or crisis intervention operations and continues to use Crosspoint. ECF 33-6, Hartshorn Dep. at 66:19-23, 75:6-10.

18. Vermilion County recognizes that history of drug use and past suicide attempts can indicate an individual is suicidal. ECF 33-9, Heaton Deposition at 50:18-23, 57:1-6.

19. Through the week that she was incarcerated at Vermilion County, Kacey paced around the cell block while making comments about how she loved everyone, was a fuck-up, and had hurt a lot of people in her addiction. ECF 33-12, Lewis Deposition at 40:5-24, 42:8-15.
20. On September 21, 2020, Kacey attempted suicide with the belt in the shower area of the jail by looping the belt around her neck and hanging herself on the shower head. ECF 33-12, Lewis Deposition at 18:13-19:19; See also Def. Ex. N, 3-Dorm Video at 1:43:29 p.m. to 1:44:05 p.m.).
21. Ms. Lewis saw Kacey with the belt wrapped around her neck. Id. at 48:4-6.
22. Kacey attempted suicide a second time in the cell she shared with Ms. Lewis on A-Block by looping the belt through a metal divider on the cell window and hanging herself with it. Id. at 50:8-52:5.
23. Both times that Lewis caught Kacey attempting suicide with a belt around her neck, Kacey denied to Lewis that she was trying to commit suicide. Id. at 57:21-4.
24. On September 22, 2024, Ms. Lewis told Vermilion officers that Kacey "had been trying to commit suicide because she had this belt." Id. at 14:14-24; See also ECF 33 at ¶¶ 40, 43 (Defendants admitting Harbacek and Harding were told about at least one suicide attempt on September 22).
25. Ms. Lewis specifically told Officer Harbacek that Ms. Miller had attempted suicide twice. ECF 33-12, Lewis Deposition at 53:3-18; See also ECF 33-3, Harbacek Deposition at 101:20-24 (acknowledging that Lewis told her Kacey tried to hang herself).
26. Ms. Lewis told Officer Harbacek, who went by Bobby, "Bobby, she got a belt. She been trying to kill herself. Ooh, woo, you all need to do something." ECF 33-12 at 19:12-25, 22:20-22.
27. Ms. Lewis told Officer Harbacek that she was worried about Kacey. ECF 33-3, Harbacek Deposition at 106:9-13.

28. Nurse Harding was present for the conversation where Lewis told Officer Harbacek that Kacey had attempted suicide, had a belt, and that she was worried about her. ECF 33-3, Harbacek Deposition at 107:14-16.

29. After Ms. Lewis told Officer Harbacek about Kacey's two suicide attempts, she confiscated the belt by having Ms. Lewis retrieve it for her, but no one conducted a search of Kacey's cell. ECF 33-12, Lewis Deposition at 53:3-24; ECF 33-3, Harbacek Deposition at 108:9-110:4.

30. After she confiscated the belt, Officer Harbacek told Captain Osterbur that Miller had attempted suicide and had a belt in her cell. ECF 33-3, Harbacek Deposition at 108:12-21, 112:2-113:14.

31. After Officer Harbacek told Captain Osterbur about Kacey's belt and suicide attempts, Osterbur spoke with Kacey in an "attorney room" with Officer Harbacek present. ECF 33-3, Harbacek Deposition at 114:18-115:2.

32. Captain Osterbur questioned Kacey about her suicidal intent, but neither he nor Officer Harbacek took notes of the interaction. ECF 33-3, Harbacek Deposition at 115:17-117:17.

33. Captain Osterbur did not ask Kacey if she had a plan to commit suicide, if she was going through withdrawals, whether she had any visits scheduled, or whether she had any legal concerns. ECF 33-3, Harbacek Deposition at 117:9-118:19; ECF 33-2, Osterbur Deposition at 82-83. Osterbur did not ask her anything about her mental health beyond whether or not she was suicidal. ECF 33-2, Osterbur Deposition at 83:1-11. He never spoke to Ms. Lewis about Kacey. Id. at 100:15-17.

34. No one contacted Crosspoint on September 22, 2020, the day that Osterbur and Harbacek learned of Kacey's suicide attempts. ECF 33-3, Harbacek Deposition at 120:23-121:10; ECF 33-2, Osterbur Deposition at 85:5-13.

35. A jail employee should have reported these suicide attempts to a mental health professional. Ex. 2, Sinner Report at 14-15.
36. Captain Osterbur should have placed Kacey on suicide watch upon learning of her suicide attempt. Ex. 1, Sinner Deposition at 45:12-26:20.
37. Kacey's recent suicide attempts needed to be considered by a mental health professional. Ex. 7, Patterson Report at 7.
38. While doing her cell check the next day, September 23, 2020, Harbacek noticed a change in Kacey's demeanor
39. Kacey asked Harbacek if she could talk to someone on September 23, 2020. ECF 33-3, Harbacek Deposition at 124:8-125:12.
40. Officer Harbacek inferred based on their conversation the previous day that Kacey wanted to speak to the mental health staff at Crosspoint. ECF 33-3, Harbacek Deposition at 125:6-126:20.
41. Officer Harbacek informed Captain Osterbur that Kacey wanted to speak with someone, and they informed Nurse Harding together. ECF 33-3, Harbacek Deposition at 127:9-21.
42. Officer Harbacek knew that major depression, drug abuse, and past history of suicide attempts can be risk factors for suicide. ECF 33-3 at 72:1-12.
43. Officer Harbacek knew that Kacey was going through withdrawals. ECF 33-3 at 93:5-9.
44. Officers are required to place detainees in the padded cell if they are a suicide risk ECF 33-6, Maskel Deposition at 49:13-18.
45. Kacey was not placed in a padded cell after Osterbur and Harbacek learned of her suicide risk. ECF 33-2, Osterbur Deposition at 76:13-21.
46. Captain Osterbur "initiated the steps to get [Crosspoint] in" to see Kacey, but he denies having any direct communication with them. ECF 33-2, Osterbur Deposition at 86:6-88:12.

47. Nurse Harding informed Crosspoint that Kacey "was needing to speak with someone. She just wanted to talk," but does not recall telling Crosspoint other details attendant to her suicide risk. ECF 33-8, Harding Deposition at 59:8-60:2.

48. Captain Osterbur believed Kacey to be a suicide risk at the time that she requested to talk to someone at Crosspoint. ECF 33-2, Osterbur Deposition at 87:23-88:3.

49. Captain Osterbur knew that he could provide reports of attempted suicide to mental health staff at Crosspoint, but it was not the standard in the Vermilion County Jail to do so. ECF 33-2, Osterbur Deposition at 49:2-15.

50. Vermilion County procedure provides that officers who are made aware of a suicide attempt should document it in the detainee's file (called a "jacket") so that other personnel stay apprised of such information. ECF 33-9, Heaton Deposition at 75:7-22, 92:24-11.

51. Captain Osterbur believed that when a suicide attempt occurred, he was supposed to generate a report in the jail's New World system so that other staff had access to the information. ECF 33-3, Osterbur Deposition at 48:21-49:7.

52. The information in New World is the same information that is in the jacket. ECF 33-16, Maskel Deposition at 64:1-15.

53. Captain Osterbur did not take any notes of his conversation with Kacey and did not upload the information to the jail's New World system. ECF 33-2, Osterbur Deposition at 81:10-82:2. Officer Harbacek did not document any information about Kacey, either. ECF 33-3, Harbacek Deposition at 114:14-17, 118:20-122:24.

54. Captain Osterbur was trained and knew that a prior suicide attempt was a factor in the assessment of an individual's suicide risk, and that he could utilize the suicide-resistant padded cell if there was a suicide attempt. ECF 33-2 at 46:19-47:2, 53:17-54:3, 66:3-9.

55. Officer Harbacek was trained that drug abuse and a history of suicide attempts are risk factors for suicide. ECF 33-3 at 72:6-12.
56. Harbacek was trained and aware that if a detainee had a suicide attempt, such would be pertinent information to tell the officer taking over her shift. ECF 33-3, Harbacek Deposition at 59:16-60:22.
57. Captain Osterbur testified that the information provided by Ms. Lewis regarding Kacey's attempted suicides "would be part of the process" of determining whether she was a suicide risk. ECF 33-2, Osterbur Deposition at 73:14-74:5.
58. When he evaluated Kacey, Crosspoint mental health professional James Dewey knew that Kacey had snuck in a belt. ECF 33-5, Dewey Deposition at 122:1-21.
59. Mr. Dewey believed that although Kacey had snuck a belt into her cell, she had explicitly chosen not to make any suicide attempt with it. ECF 33-5, Dewey Deposition at 122:1-21.
60. Upon his assessment of Kacey Miller, James Dewey had received no information that another detainee had reported that Ms. Miller had attempted to self-harm. See ECF 33-5, Dewey Deposition at 176:17-21.
61. James Dewey testified that it was important to his assessment whether or not the individual had recently attempted suicide, ECF 33-5, Dewey Deposition at 59:18-60:4.
62. James Dewey testified that he would have considered Kacey's bipolar disorder diagnosis in conducting his suicide assessment, but it was not common procedure to have been informed of this kind of information. ECF 33-5, Dewey Deposition at 109:10-12, 117:13-119:8, 175:7-24.
63. Mr. Dewey testified that it would be helpful to his assessment to know that the individual had attempted suicide with a belt within 24 hours of meeting with him because "[i]t shows pattern and history. More to the point it would show intent […]" ECF 33-5, Dewey Deposition at 59:18-60:4.

64. It was not James Dewey's expectation that corrections officers would share knowledge of the individual's recent suicide attempts with him. ECF 33-5, Dewey Deposition at 63:7-15. It was not "procedure" to consult with jail personnel regarding a detainee being assessed. Id. at 175:7-21.

65. It was the procedure of Crosspoint counselors to conduct their assessment without asking questions of jail personnel because they "don't want someone else's opinion clouding what [they] do." See ECF 33-5, Dewey Deposition at 175:7-176:21.

66. Mr. Dewey's duty as a crisis counselor was to "recommend yes or no" regarding whether an individual he was assessing was clear to go into general population, or whether they should go on suicide watch. ECF 33-5 at 108:15-19.

67. Mr. Dewey knew that detainees in general population could use a bed sheet to commit suicide. ECF 33-5 at 126:16-23.

68. Ater his assessment of Kacey, Mr. Dewey stopped by Sergeant Maskel's and Nurse Harding's respective offices to let them know that Kacey was cleared to return to general population. ECF 33-5, Dewey Deposition at 101:22-103:9.

69. Mr. Dewey ultimately decided whether Kacey Miller should go to general population without any input from jail personnel. ECF 33-5, Dewey Deposition at 186:2-187:3.

70. The primary distinction between a moderate and high risk in Mr. Dewey's assessment of an individual's suicide risk is whether or not they have motive, intent, and a plan to commit suicide in addition to the ability to receive a weapon. ECF 33-5, Dewey Deposition at 125:20-126:15.

71. James Dewey believed that someone assessed at Kacey's suicide risk—moderate—would need to follow up with Crosspoint and get therapy to "deal with the problems at hand." ECF 33-5, Dewey Deposition at 127:4-11.

72. James Dewey advised Kacey to seek mental health services once she got out of jail. ECF 33-5, Dewey Deposition at 148:18-24.

73. James Dewey developed a safety plan with Kacey at the end of their assessment "NA meetings and lake" under "People I can call or places I can go that will help take my mind off my problems." ECF 33-5, Dewey Deposition at 111:19-112:18.

74. Kacey did not have access to the lake in jail. ECF 33-5, Dewey Deposition at 111:19-113:11.

75. James Dewey did not know if Kacey had access to Narcotic Anonymous meetings at Vermilion County. Id.

76. The safety plan was explicitly created with the assumption that Kacey would not be incarcerated. ECF 33-5, Dewey Deposition at 113:15-114:1.

77. James Dewey did not assist Kacey in developing a safety plan for use in the jail. ECF 33-5, Dewey Deposition at 115:19-23.

78. The safety plan "was inadequate and inappropriate for a jail setting" because its "intervention strategies, follow-up and support resources, and access to Ms. Miller's personal support system were not available to her while she was detained at VCJ and would not be available to anyone in a jail setting." Ex. 7, Patterson Report at 8.

79. "According to mental health standards, Ms. Miller should have been given a safety plan that she was actually able to follow while in custody at Vermilion County, yet Mr. Dewey made no effort to develop such a plan for Ms. Miller." Id.

80. There is a nearly "universal belief among Vermilion County Jail leadership and the Crosspoint mental health provider that denial of suicidal ideation is the single manner in which to determine risk." Pl. Ex. 2, Sinner Report at 14.

81. Nurse Harding testified that the only way to determine whether someone is suicidal is if they make comments that they are suicidal. ECF 33-8, Harding Deposition at 28:15-20.

82. Mr. Dewey "demonstrated severe lack of knowledge, expertise, and appreciation regarding risk factors and protective factors to consider when assessing an individual for suicide and/or self-harm, particularly when assessing an individual in a jail setting." Ex. 7, Patterson Report.
83. At the time of his assessment, Mr. Dewey believed that "beyond a shadow of a doubt if someone who's truly suicidal would answer that question, yes, I'm thinking about killing myself." ECF 33-5, Dewey Deposition at 45:16-46:15.
84. James Dewey was not trained nor did he have any knowledge that assessment of suicide risk can be different for individuals in custody. ECF 33-5, Dewey Deposition at 46:16-47:4, 65:14-24.
85. James Dewey believed that an individual's "[p]otential lethality including harm to self and others" was not a "big concern" in a jail. ECF 33-5, Dewey Deposition at 74:7-13.
86. James Dewey did not ask Kacey whether she was in withdrawal or needed medications for drug use because it was "not a question on [Crosspoint's] checklist." ECF 33-5, Dewey Deposition at 104:10-14.
87. James Dewey believed that an individual's history of anxiety or panic attacks is not relevant to their suicide risk. ECF 33-5, Dewey Deposition at 111:4-10.
88. James Dewey did not have any mental-health-related licensure at the time of his assessment of Kacey Miller. ECF 133-5, Dewey Deposition at 157-158.
89. James Dewey believed he could not review Kacey's prior records because it would violate her HIPAA rights. ECF 33-5, Dewey Deposition at 25.
90. [B]est correctional practices dictate that "information related to continuity of care can [] should be shared, even in consideration of the Health Insurance Portability and Accountability Act (HIPPA)'s restrictions." Pl. Ex. 2, Sinner Report at 15.

91. Crosspoint's training and written policies instructed counselors to consult with "collateral sources" to obtain material information about a potentially suicidal detainee. ECF 33-4, Nelson Deposition at 31-32.

92. Crosspoint staff are permitted to "disclose information to a correctional institution or law enforcement official to continue or assist in treatment and to maximize the safety and security for the individual and others within the correctional institution." Pl. Ex. 9, Releases of Information.

93. Counselors are trained to share their assessments and safety plans with jail staff, that detainees may not provide all "relevant information," and that they should gather "relevant information" from "collateral sources," including jail staff in case the individual they are assessing omits relevant information. ECF 33-4, Nelson Deposition at 30:9-32:17.

94. Mr. Dewey's crisis evaluations were reviewed by his supervisors at Crosspoint, not Vermilion County employees. ECF 33-5, Dewey Deposition at 93:11-94:12; ECF 33-9, Heaton Deposition at 178:24-179:19.

95. Review of Mr. Dewey's notes were conducted by a mental health supervisor who is not present for the assessment, would not change anything, and would not have a necessary opinion. ECF 33-5, Dewey Deposition at 184:14-185:9.

96. Crosspoint employees received no training or orientation from Vermilion County. ECF 33-4, Nelson Deposition at 20:21-21:9, 23:6-10, 27:13-23, 29:1-24.

97. Vermilion County did not provide access to any jail training related to suicide risk or assessment to Crosspoint employees. ECF 33-4, Nelson Deposition at 29:1-24.

98. There is no contract describing the relationship between Crosspoint and Vermilion, what Crosspoint employees are responsible for, or what Crosspoint employees are expected to do. ECF 33-4, Nelson Deposition at 23:6-10.

99. The only document outlining any agreement between Crosspoint and Vermilion County is a letter from Crosspoint's Chief Financial Officer stating "Crosspoint Human Services has an agreement to provide mental health services to the Public Safety Building of Vermilion County." Pl. Ex. 8, Crosspoint Letter.

100. There was no contract in place that defined the responsibilities, expectations, or procedures of Crosspoint or its employees. ECF 33-4, Nelson Deposition at 20:21-21:9, 23:6-10, 27:13-23, 29:1-24; Id.

101. The only two housing options that a Crosspoint employee can recommend when assessing an individual's suicide risk are 1) general population and 2) full suicide precautions in a padded cell. ECF 33-4, Nelson Deposition at 27:6-19.

102. Crosspoint employees are not trained or told by Vermilion County what items or services detainees have access to in general population. ECF 33-4, Nelson Deposition at 27:13-23, 28:4-24)

103. Crosspoint's 30(b)(6) witness testified counselors are trained to share their assessments and safety plans with jail staff, that detainees may not provide all "relevant information," and that they should gather "relevant information" from "collateral sources," including jail staff in case the individual they are assessing omits relevant information. ECF 33-4, Nelson Deposition at 30:9-32:17.

104. Officer Harbacek did not inform any other officers, such as the ones that took over her shift, of Kacey's suicide attempt, nor did she speak to any Crosspoint professionals about Kacey. ECF 33-3, Harbacek Deposition at 129:10-13,167:11-15.

105. Neither Officer Harbacek, Captain Osterbur, nor Nurse Harding informed Mr. Dewey or any Crosspoint professional of Kacey's suicide risk factors, including her recent suicide attempts. ECF 33-2, Osterbur Deposition at 49:2-15, 81:10-82:2, 86:6-88:12, 105:3-7, 111:8-12; ECF 33-3,

Harbacek Deposition at 37:3-10 (she did not have direct communication with Crosspoint as a corrections officer), 167:11-15; ECF 33-8, Harding Deposition at 59:1-60:7; ECF 33-5, Dewey Deposition at 63:7-15, 176:17-21, 186:2-187:3.

106. Crosspoint did not consult with Kevin Maskel, the officer who physically escorted Mr. Dewey to see Kacey, regarding Kacey. ECF 33-16, Maskel Deposition at 79:17-80:6, 87:20-88:1.

107. Defendant Osterbur was the Captain of the Vermilion County Jail at the time of Kacey's death, making him the jail administrator responsible for overseeing the function of the jail as it pertains to the sheriff's department. ECF 33-9, Heaton Deposition at 16:6-14; ECF 33-2, Osterbur Deposition at 108:16-109:14.

## IV. Legal Standard

Summary judgment is only warranted when the evidence, viewed in a light most favorable to the non-moving party, presents "no genuine issue as to any material fact" such that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). All disputed issues of fact are to be resolved in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, (1986). Thus**,** summary judgment may be granted only if there are no disputed genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 753-54 (7th Cir. 2006).

## V. Officers Harbacek and Captain Osterbur

To survive summary judgment for her Fourteenth Amendment claims against the individual Defendants for their failure to provide medical care and attention and failure to protect from self-harm, Plaintiff must provide evidence that the defendants' actions were objectively unreasonable and caused her injuries. *Jump v. Vill. of Shorewood*, 42 F.4th 782, 793 (7th Cir. 2022). Courts "view this objective standard not mechanically but in light of the totality of the facts and circumstances of each particular case." *Id.* "[W]hen an officer has no reason to think a detainee is suicidal, it is not

objectively unreasonable to take no special precautions," but for a case involving a pretrial detainee, such as this one, she does not have to prove the *subjective* knowledge component required under the deliberate indifference standard *Id.*

**A. Officer Harbacek and Captain Osterbur had reason to believe Kacey was suicidal.**

"Suicide is a 'serious harm' and prison officials must take reasonable preventative steps when they are aware that there is a substantial risk that an inmate may attempt to take his own life." *Est. of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000). A reasonable jury could find that Captain Osterbur and Officer Harbacek had every reason to believe that Kacey Miller was a suicide risk. Viewing the facts in the light most favorable to the plaintiff, they were both advised that Kacey had made two suicide attempts while in the Vermilion County jail, which is a significant indicator of suicide risk. Pl. Fact ¶¶ 20-30, 54-57. Officer Harbacek knew that she was going through drug withdrawals, which is a factor of suicide risk. Pl. Fact ¶¶ 43, 55. Captain Osterbur admitted that he believed Kacey to be a suicide risk at the time that she requested to talk to someone at Crosspoint. Pl. Fact ¶ 48.

Courts in this Circuit have repeatedly emphasized recent suicide attempts as one of if not the most significant indicators of imminent suicide risk. *Mombourquette ex rel. Mombourquette v. Amundson*, 469 F. Supp. 2d 624 (W.D. Wis. 2007)( "By themselves, plaintiff's two previous attempts of self harm would be sufficient to create a jury question [regarding whether defendants were aware of a substantial risk of serious harm]"); *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 928 (7th Cir. 2004) (citing a suicide attempt in the same year as a completed suicide as a factor tending to show suicide risk); *Sanville v. McCaughtry,* 266 F.3d 724 (7th Cir. 2001) (previous suicide attempt and history of mental illness heightened the seriousness of a plaintiff's unusual behavior such that a jury could find jailers were "on notice that there was a significant likelihood that he would attempt to harm himself"); *Hall v. Ryan*, 957 F.2d 402, 405 (7th Cir. 1992) (whether jailers knew of individual's

history of suicide attempts created a genuine issue of material fact). The court in *Mombourquette* went so far to say that, "[i]n all of the published appellate cases [the court] reviewed, […] when the defendants were aware of recent suicide attempts, it would be improper to grant summary judgment or judgment as a matter of law on the question whether defendants were aware of a substantial risk of serious harm. 469 F. Supp. 2d at 638.

Defendants' reliance on Kacey's own assurances that she was not suicidal are not persuasive. ECF 33 at 21. The three cases which Defendants rely on for the proposition that Defendants were "entitled to give significant credit to her denial of suicidal ideation or actions" are not applicable here because the officers in those cases did not have knowledge of a recent suicide attempt by the decedent. In *Est. of Wallmow v. Oneida Cnty.*, 99 F.4th 385, 389 (7th Cir. 2024), the officers implemented more frequent cell checks after the decedent started hitting himself and made disturbing statements, but there was no evidence of actual suicidal intent. In *Pulera v. Sarzant,* 966 F.3d 540, 549 (7th Cir. 2020), the decedent told others he may die with anti-anxiety medication and drug his thumb across his neck as if to indicate he would harm himself. In *Maxwell v. Outagamie Cnty. Jail*, No. 20-CV-386, 2022 WL 17300881 *10 (E.D. Wis. Nov. 29, 2022), "[a]ll [the defendant] knew was that [the decedent] was subject to a red tag and therefore merited closer observation." None of those individuals had demonstrated intent to commit suicide by, for example, making attempts on their lives while in custody. Defendants statement that Kacey "did not appear distressed or show unusual behavior on the 22nd" is patently untrue when taking the facts in the light most favorable to Plaintiff; she had attempted suicide that day. Kacey's demonstration of intent to commit suicide places this case is a different universe than *Pulera, Maxwell,* or *Wallmow.*

Vermilion County, as a matter of policy, recognizes that history of drug use and past suicide attempts can indicate an individual is suicidal. Pl. Fact ¶ 18. Captain Osterbur was trained and knew that a prior suicide attempt was a factor in the assessment of an individual's suicide risk, and that he

could utilize the suicide-resistant padded cell if there was a suicide attempt. Pl. Fact ¶¶ 54, 57. Officer Harbacek was trained that drug abuse and a history of suicide attempts are risk factors for suicide. Pl. Fact ¶¶ 55-56. At bottom, it is common sense that a recent suicide attempt is a strong indicator that a detainee has suicidal intent. Armed with the knowledge that Kacey had tried to take her own life *twice* since she entered the jail on September 19, Harbacek and Osterbur were on notice of Kacey's suicide risk, and thus required to take reasonable measures to protect her from her self-destructive tendencies.

**B. Officer Harbacek and Captain Osterbur responded unreasonably to Kacey Miller's suicide risk.**

This duty to respond reasonably to a suicide risk includes a duty to inform others responsible for an individuals' care and custody of material information related to that individual's suicide risk. In *Cavalieri v. Shepard*, the defendant—one of the police officers who arrested Steven Cavalieri—was advised by Steven's mother that he should be on suicide watch because he was suicidal and was advised by his former girlfriend that plaintiff threatened to kill himself and had made the statement that he would kill himself if he ever went back to jail. 321 F.3d 616, 618-619 (7th Cir. 2003). The officer also knew that Steven had been on suicide watch the month before. *Id.* The officer, however, "did not subjectively believe that Steven was a suicide risk" because he was calm when he spoke to the officer, did not have weapons, and stated he was "doing fine" during their conversation. *Id.* at 619. After his arrest, Steven was admitted to a carceral facility, where he did not tell anyone that he was having suicidal thoughts, denied ever attempting suicide or having suicidal thoughts, did not ask to speak to a mental health advisor. *Id.* at 619-620. The defendant officer did not inform the facility of the information regarding his suicide risk despite many opportunities to do so. *Id.* at 622.

The Court found that a reasonable jury could believe his actions to be sufficient to establish a constitutional violation—even under the more difficult "deliberate indifference" standard. The

*Cavalieri* Court rejected the officer's implication that "he did not have to pass along any information to his colleagues in the county jail." *Id.* at 623. "While there are different arms of state government, the walls between them are not as high as Shepard implies. **To the contrary, each must keep the other informed about material facts, including suicide risks**." *Id.* (emphasis added).

Defendants were aware of the importance of this exchange of information. Harbacek was trained and aware that if a detainee had a suicide attempt, such would be pertinent information to tell the officer taking over her shift. Pl. Fact ¶ 56. Captain Osterbur testified that staff were supposed to generate reports of suicide attempts so that he was aware such a situation occurred. Pl. Fact ¶ 51. Captain Osterbur testified that the information provided by Ms. Lewis regarding Kacey's attempted suicides "would be part of the process" of determining whether she was a suicide risk. Pl. Fact ¶ 57. A reasonable jury could thus find that Captain Osterbur and Officer Harbacek were objectively unreasonable in responding to Kacey's suicide risk in two respects. First, upon learning that she had attempted to hang herself twice while on drug withdrawals, they did not notify any mental health professional or make any written report in Kacey's file or refer her to a mental health professional. Pl. Fact ¶ 32, 34, 49, 53, 104. Second, when they did finally notify the mental health provider, Defendants made no effort to ensure that the provider knew Kacey had demonstrated suicidal intent. Even though Kacey **had attempted suicide twice**, was going through drug withdrawals, and knew she was about to return to prison, neither Defendant made any effort to notify Crosspoint personnel of her most concerning risk factors. Pl. Fact ¶¶ 20-27, 39, 43, 46, 105. Osterbur was responsible for overseeing the jail and, although Vermilion imposed a duty on officers to give pertinent information to Crosspoint, yet he testified that he initiated the steps to summon Crosspoint, but never spoke to personnel about Kacey, nor did he take any other measure to ensure the communication of Kacey's suicide risk. Pl. Fact ¶¶ 12, 46, 53, 105, 107. Harbacek did not inform any other correctional officer or Crosspoint employee, including officers taking over her shift of the

suicide attempts. ¶¶ 56, 104-105. This resulted in a Crosspoint counselor, who was responsible for determining what measures to take for Kacey's safety, conducting a suicide risk assessment without *any* knowledge that Kacey had just tried to commit suicide *twice*. Pl. Fact ¶¶ 59-61. A reasonable jury could find that it was objectively unreasonable for Defendants to not only fail to report Kacey to Crosspoint after learning of her suicide attempts, but to fail to communication such material information regarding Kacey's suicidal intent from the mental health provider even after it was determined that she was actively suicidal and needed to be assessed.

**C. Officer Harbacek and Captain Osterbur's conduct caused Kacey Miller's death.**

A rational jury could find that if Harbacek and Osterbur relayed this information to Dewey, he would have designated her a high suicide risk and imposed suicide precautions. Mr. Dewey testified that it would be helpful to his assessment to know that the individual had attempted suicide with a belt within 24 hours of meeting with him because "[i]t shows pattern and history. More to the point it would show intent […]" Pl. Fact ¶ 63. Mr. Dewey knew that detainees in general population could use a bed sheet to commit suicide. Pl. Fact ¶ 67. The primary distinction between a moderate and high risk in Mr. Dewey's assessment of an individual's suicide risk is whether or not they have motive, intent, and a plan to commit suicide in addition to the ability to receive a weapon. Pl. Fact ¶ 70. A reasonable jury could thus conclude that, had Dewey known Kacey had exhibited intent, motive, and a plan to commit suicide less than a day prior, he would have designated her a high suicide risk and put her in a suicide resistant cell until she was deemed by a mental health professional to no longer be a suicide risk. Pl. Fact ¶¶ 5, 6, 63, 67, 70.

Defendants' act of referring Kacey to Crosspoint did not break the causal chain for their actions prior to Crosspoint's assessment. Defendants failed to relay material information to Crosspoint, causing the Crosspoint assessment to lack the information most pertinent to Kacey's safety: that she had recently attempted suicide and was an active suicide risk. Pl. Fact ¶¶ 46, 53, 59-

61, 105. A reasonable jury could conclude that Crosspoint's knowledge of the suicide attempts would have led to her being placed in a suicide resistant cell until a Crosspoint employee—who was still aware that she had recently attempted suicide—cleared her because it would have indicated that key factor of intent to the Crosspoint professionals. Pl. Fact ¶¶ 59-63, 70. Because Defendants failed to share information of Kacey's suicide risk (in violation of internal policies and the directives of *Cavalieri*), she was not placed in protective custody and never received an evaluation of her suicide risk that considered her recent suicide attempts. Pl. Fact ¶¶ 12, 45, 68. A reasonable jury could find that the simple act of sharing such material information would have completely changed the trajectory of events by ensuring Kacey was subject to an accurate assessment of her suicide risk and placing her into protective custody. Instead, Kacey was able to successfully conceal her suicidal intent from Crosspoint despite Defendants' knowledge of her self-destructive tendences.

**D. Officer Harbacek and Captain Osterbur violated clearly established law.**

Defendants are not entitled to qualified immunity. In assessing whether qualified immunity is appropriate, the Court "must first determine whether (taking the facts in the light most favorable to the plaintiff) a constitutional right was violated, and second, if those facts would demonstrate a violation, [ ] whether the right in question was clearly established at the time the events took place. *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003). [A] district court properly denies a motion for summary judgment based on qualified immunity when the facts, viewed in the light most favorable to the plaintiff, create a genuine dispute about whether the defendants' actions violated a clearly established constitutional right. *Chilcutt v. Santiago*, No. 22-2916, 2023 WL 4678583, at *3 (7th Cir. July 21, 2023) (citing *Estate of Clark v. Walker*, 865 F.3d 544, 549–50 (7th Cir. 2017)). The question of whether an individual's suicide risk is "sufficiently acute" or whether the defendants "actually knew" of an individual's risk, then disregarded it are "factual in nature." *Est. of Clark v. Walker*, 865 F.3d 544 (7th Cir. 2017). As discussed, there is sufficient evidence in the record to allow a jury to find

that Officer Harbacek and Captain Osterbur violated Kacey's constitutional rights. The only question remaining is whether that right was clearly established at the time.

"The rule that officials, including police officers, will be 'liable under section 1983 for a pre-trial detainee's suicide if they were deliberately indifferent to a substantial suicide risk' [internal citation omitted] was clearly established prior to 1998." *Cavalieri*, 321 F.3d at 623-24; See also *Est. of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017) ("Clark's right to be free from deliberate indifference to his risk of suicide while he was in custody was clearly established at the time of his death in 2012."); *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (There can be little debate that it was clearly established, long before 1998, that prison officials will be liable under Section 1983 for a pretrial detainee's suicide if they were deliberately indifferent to a substantial suicide risk." (internal quotations omitted)). More specifically, defendants were on notice that they had a responsibility to keep other arms of government informed about material facts attendant to a detainee's safety, including suicide risk. *Cavalieri*, 321 F.3d at 623. As discussed, *supra*, the *Cavalieri* Court found that an officer who had material information regarding an individual's potential suicide risk had a duty to inform other entities responsible for the detainee. *Id.* Indeed, Vermilion County's formal policy required County officers to share information with Crosspoint regarding "the situation" but Osterbur and Harbacek testified that he did not even speak with Crosspoint staff. Pl. Fact ¶¶ 12, 104-105. Similarly, Crosspoint's formal policy advised counselors to consult with officers. Pl. Fact ¶¶ 91-93. Yet, neither Defendant made such an effort. Pl. Fact ¶¶ 46, 49, 53, 104-105.

*Cavalieri* put officers on notice that if they are going to relinquish responsibility for the safety of a detainee, they must, at the very least, make the entity who *is* responsible for their safety aware of any known "life-threatening situation." 321 F.3d at 623-24. Here, it is undisputed that the Crosspoint counselor had complete discretion and authority to determine what measures would be

taken to ensure Kacey was protected from her self-destructive tendencies. ECF 33 at 23. Harbacek and Osterbur knew that Kacey was an imminent suicide risk due to her *two* unsuccessful attempts, and their argument is predicated on the notion that they fulfilled their obligations to respond to that risk by placing Kacey's safety in another entity's hands. ECF 33 at 28-29. From there, per their argument, their only responsibility was to follow the recommendation of the Crosspoint counselor. Id. If that is true, though, *Cavalieri* put them on notice that they were required to inform the other entity of their "knowledge of a life-threatening situation." 321 F.3d at 623-24. They did not. Pl. Fact ¶¶ 46, 49, 53, 104-105.

## VI. Vermilion County Policies

To establish municipal liability under § 1983, Plaintiff must show that Kacey was "deprived of a federal right, as a result of an express municipal policy, widespread custom, or deliberate act of a decision-maker for [Vermilion] County, which proximately caused [her] injury." *Davis v. Carter*, 452 F.3d 686, 691 (7th Cir. 2006). Here, such policies and customs would include those implemented by Vermilion County itself, but it also includes those set for by its contractor, Crosspoint, who the County delegated final decision-making authority to. Plaintiff sets forth evidence of two policies in Vermilion County that caused Kacey's injuries: 1) widespread custom of depriving mental health providers of material information attendant to suicide risk and 2) a widespread custom of performing inadequate and perfunctory suicide assessments.

### A. Vermilion County is liable for policies it set forth directly and those it set forth via its contractor, Crosspoint.

A municipality's duty to provide a constitutionally acceptable level of medical care to people in custody is not absolved by contracting with a private entity. See *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) ("The County cannot shield itself from § 1983 liability by contracting out its duty to provide medical services."). "[T]he private company's policy becomes that of the County if the County delegates final decision-making authority to it." *Id.* Thus, delegating final decision-

making authority to a private entity is also not a viable defense against liability. *Awalt v. Marketti*, 74 F.Supp. 3d 909, 933 (N.D. Ill. 2014) (citing *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010)). In *King*, "evidence presented for summary judgment purposes show[ed] that the County's policy was to entrust final decision-making authority to HPL over inmates' access to physicians and medications." 680 F.3d 1020. Plaintiff provided sufficient evidence that HPL, the private contractor, had a widespread practice of switching prescription regimens without appropriate physician oversight. *Id*. Such evidence, in turn, supported a *Monell* claim against the *county* who contracted and delegated decision-making authority to HPL. *Id*.

Vermilion County delegated to Crosspoint the final decision-making authority regarding suicide prevention measures to be taken for inmates. It is undisputed that "Crosspoint had been the exclusive provider for crisis mental health services [at Vermilion County] for many years," Crosspoint mental health professionals would be called to conduct crisis evaluations and recommend whether the detainee should be placed on suicide watch, and **Crosspoint's recommendation was always followed.** ECF 33 at 23. Vermilion County did not have a suicide prevention policy of its own, further indicating its delegation to Crosspoint for such services. Pl. Fact ¶ 1. There appears to be no dispute that Vermilion County delegated the duty of identifying suicide risk then recommending the appropriate prevention measures to Crosspoint and its "qualified mental health professionals," such as James Dewey. ECF 33 at 23. Like HPL in *King*, Crosspoint was the final decision-maker regarding suicide potential evaluation at the Vermilion County Jail. As in *King,* the fact that Vermilion County delegated final decision-making authority to Crosspoint does not absolve it of liability. Quite the opposite: Vermilion County is liable under *Monell* for the unconstitutional policies implemented by Crosspoint.

### B. Vermilion County maintained widespread, unconstitutional customs regarding suicide prevention that carried the force of law.

#### *i. Vermilion County had a widespread practice of failing to inform Crosspoint counselors of material information regarding an individual's suicide risk upon Crosspoint's assessment.*

Plaintiff outlined, *supra*, the extent to which the Seventh Circuit has emphasized the importance of communication between entities responsible for the safety of inmates regarding "life-threatening situation[s]," including an imminent risk of suicide. *Cavalieri*, 321 F.3d 616, 620 (7th Cir. 2003). Indeed, the agents articulating the 'formal' policies of both Vermilion County and Crosspoint recognized the importance of such communication as it pertains to correctional officers and mental health providers. It is the formal policy of Vermilion County, per their 30(b)(6) witness, that command officers are responsible for calling Crosspoint's crisis line to "give them the information that [they] have on the situation." Pl. Fact ¶ 12. Crosspoint's 30(b)(6) witness testified counselors are trained to share their assessments and safety plans with jail staff, that detainees may not provide all "relevant information," and that they should gather "relevant information" from "collateral sources," including jail staff in case the individual they are assessing omits relevant information. Pl. Fact ¶¶ 91-93.

The *actual* practice at Vermilion County, however, was the opposite: there is evidence that it was the normal course of conduct for Vermilion County employees to *withhold* material information[1] to Crosspoint staff. James Dewey testified that it was important to his assessment whether or not the individual had recently attempted suicide, Pl. Fact ¶ 61, yet, it was not his expectation that corrections officers would share knowledge of the individual's recent suicide attempts with him. Pl.

[1] Mr. Dewey testified that he could not review Kacey's prior records because it would violate her HIPAA rights. Pl. Fact ¶¶ 89. As discussed, formal policies articulated by 30(b)(6) witnessed indicated the contrary. Pl. Fact ¶¶ 12, 91-93. In reality, best correctional practices dictate that "information related to continuity of care can [] should be shared, even in consideration of the Health Insurance Portability and Accountability Act (HIPPA)'s restrictions." Pl. Fact ¶ Sinner Report at 90. Dewey's erroneous belief regarding the appropriate transfer of information underscore the extent to which the practices of withholding information were widespread at Vermilion County in contrast to the policies articulated by 30(b)(6) witnesses.

Fact ¶ 64. Indeed, it was not their "procedure" to receive information from jail personnel such as Nurse Harding (who knew that Kacey had attempted suicide). Pl. Fact ¶ 64. Mr. Dewey also testified that he "would not know" whether Kacey had previously been diagnosed with bipolar disorder, even though he would have considered it in his assessment if he was aware of it. Pl. Fact ¶ 62. He understood these to be the procedures having conducted "several hundred" crisis assessments. ECF 33 at ¶ 58. Captain Osterbur knew that he could provide reports of attempted suicide to mental health staff at Crosspoint, but that **it was not standard in the Vermillion County Jail to do so.** Pl. Fact ¶ 49. Harbacek testified that she did not have direct communication with Crosspoint as an officer, and, indeed, no one told Crosspoint about Kacey's attempts. Pl. Fact ¶ 105. Dewey did not consult with the sergeant that escorted him to his evaluation of Kacey. Pl. Fact ¶ 106. Dewey's steadfast expectation that he would not receive information from jail personnel was corroborated by the testimony and actions of jail staff, Pl. Fact ¶¶ 46, 49, 53, 104-106, incating that Vermilion County's widespread custom was to not provide material information to Crosspoint crisis assessors.

*ii. Vermilion County had a widespread practice of conducting inadequate and perfunctory suicide assessments.*

There is a nearly "universal belief among Vermilion County Jail leadership and the Crosspoint mental health provider that denial of suicidal ideation is the single manner in which to determine risk." Pl. Fact ¶ 80. This belief is contrary to standards in the mental health industry,[2] the Illinois Administrative Code's County Jail Standards 701.70(a)(5), (8), (9), (10), and the case law governing Ms. Miller's claims, all of which articulate a multi-factor approach in determining an individual's suicide risk. See *Est. of Clark v. Walker*, 865 F.3d 544 (7th Cir. 2017) (question of fact

[2] See e.g., National Commission on Correctional Health Care, 2018 Standards for Health Services for jails and prisons, E-01 Receiving Screening (requiring reception personnel, when conducting a mental health screening, to observe and record the inmate's appearance, behavior, and any other known indicators for suicidal potential); American Correctional Association, Core Jail Standards, 1-CORE-4C-29 (mental health screenings includes observations of the inmates appearance and behavior).

remained whether defendant correctional officer knew of decedent's suicide risk based on his exhibition of "some suicide risk factors" such as history of inpatient treatment, earlier suicide attempt, family history of suicide, depression, alcoholism, and more); See also *Est. of Hill v. Richards*, 525 F. Supp. 2d 1076, 1086 (W.D. Wis. 2007) (noting defendant "was aware of a host of other factors that would have reinforced the serious nature of [Plaintiff]'s behavior," allowing a jury to find she was aware of plaintiff's substantial risk of suicide); *id.* at 1080-81 (officers are generally trained to assess suicide risk via "[i]mportant factors" including "the person's current mental state, history of depression and other mental health issues, medications that the person is taking or should be taking, plans for the future and previous attempts of self-harm").

Nevertheless, Nurse Harding testified that the *only* way to determine whether someone is suicidal is if they make comments that they are suicidal. Pl. Fact ¶ 81. Osterbur testified that when he was attempting to determine whether Kacey was suicidal after the attempts were reported, he has not recollection of asking her anything other than direct questioning of whether she was suicidal. Pl. Fact ¶ 33. He does not recall asking her about her withdrawal, whether she had ever previously attempted suicide, if she was having personal issue in her relationship, whether there were concerns attendant to her legal case, or any other question that could have elucidated a risk factor. Id. He did not even talk to Ms. Lewis about what she witnessed regarding Kacey's attempt. Id.

Perhaps most alarmingly, Mr. Dewey—who was tasked with determining which safety precautions should be in place for Kacey—testified to the following:

> A: […] Empirical research from -- research study after research study has proven beyond a shadow of a doubt if someone who's truly suicidal would answer that question, yes, I'm thinking about killing myself.· They will not beat around the bush. They will not answer any other way.
> Q: So from a laymen's perspective the question I've always had is if someone's suicidal and they want to complete suicide why would they tell anyone that they're thinking about it?
> A: Well, understand that you have two reasons, either -- either it's a cry for help so I want you to know.· Or it is just an absolute statement of at this point I have nothing to lose, I have -- I'm doing it so there would be no reason to lie about it.

Pl. Fact ¶ 85. Even beyond this erroneous statement, Dewey "demonstrated severe lack of knowledge, expertise, and appreciation regarding risk factors and protective factors to consider when assessing an individual for suicide and/or self-harm, particularly when assessing an individual in a jail setting." Pl. Fact ¶ 82. Plaintiff's mental health expert will testify that this testimony is an egregious diversion from how suicide risk evaluations should be conducted. Id. He testified that an individual's "[p]otential lethality including harm to self and others" was not a "big concern" in a jail. Pl. Fact ¶ 85. This Court has explicitly disagreed with Mr. Dewey, stating "[s]tudies abound that show higher rates of suicide among prisoners and pretrial detainees than among the general population." *Brandon v. Smith*, No. 06-1316, 2010 WL 11643322, at *15 (C.D. Ill. Aug. 18, 2010).[3] He did not ask Kacey whether she was in withdrawal or needed medications for drug use because it was "not a question on [Crosspoint's] checklist." Pl. Fact ¶ 86. He believed that an individual's history of anxiety or panic attacks is not relevant to their suicide risk. Pl. Fact ¶ 87. Indeed, Mr. Dewey did not have any mental-health-related licensure at the time of his assessment of Kacey Miller. Pl. Fact ¶ 88.

Moreover, Mr. Dewey helped Kacey develop a severely deficient "safety plan," in which Kacey designated "NA meetings and lake" under "People I can call or places I can go that will help take my mind off my problems." Pl. Fact ¶ 73. Mr. Dewey took these designations as a sign mitigating her suicide risk even though she did not have access to the lake in jail and Mr. Dewey had no idea if Vermilion County offered Narcotics Anonymous meetings; he had no idea whether Kacey could actually use any of her coping mechanisms while in jail. Pl. Fact ¶¶ 74-75. Indeed, he testified

---

[3] Additionally, "jail inmates are much more likely to commit suicide than free persons are. The likelihood of suicide is highest between 2 and 14 days of confinement." *Jutzi-Johnson v. U.S.*, 263 F.3d 753, 757 (7th Cir. 2001); *Boncher ex rel. Boncher v. Brown Cnty.*, 272 F.3d 484, 486 (7th Cir. 2001) ("As we noted recently, jail suicides are frequent relative to suicides of free people or even of prison (as distinct from jail) inmates. And the risk is concentrated in the early days and even hours of being placed in jail before the inmate has had a chance to adjust to his dismal new conditions."); *Anderson v. Templeton*, No. 00 C 3065, 2002 WL 226882, at *3 (N.D. Ill. Feb. 14, 2002)("Being in jail is clearly a stressful experience, for many reasons other than the environmental specifics, and suicide rates are higher for detainees than for other populations.").

that such safety agreements were explicitly created with the assumption that the individual would not be incarcerated. Pl. Fact ¶ 76. He did not create a safety plan for her utilization while in jail. Pl. Fact ¶ 77. Plaintiff's mental health expert will testify that this safety plan "was inadequate and inappropriate for a jail setting" because its "intervention strategies, follow-up and support resources, and access to Ms. Miller's personal support system were not available to her while she was detained at VCJ and would not be available to anyone in a jail setting." Pl. Fact ¶ 78. "According to mental health standards, Ms. Miller should have been given a safety plan that she was actually able to follow while in custody at Vermilion County, yet Mr. Dewey made no effort to develop such a plan for Ms. Miller." Pl. Fact ¶ 79. The uselessness of this safety plan underscores the superficial nature of Crosspoint and Vermilion's attempts to mitigate serious suicide risk.

In *King*, the county in question had at least entered into a contract delineating the responsibilities of the contractor. Vermilion County made *no efforts whatsoever* to ensure that Crosspoint and its agents were adequately fulfilling their responsibilities to evaluate suicide risk. Crosspoint received no training or orientation from Vermilion County, and there was no contract in place that defined the responsibilities, expectations, or procedures of Crosspoint or its employees. Pl. Fact ¶ 100. The only document outlining any agreement between Crosspoint and Vermilion County is a letter from Crosspoint's Chief Financial Officer stating "Crosspoint Human Services has an agreement to provide mental health services to the Public Safety Building of Vermilion County." Pl. Fact ¶ 99. Vermilion County did not have a suicide prevention policy of its own at the time of Kacey's death. Pl. Fact ¶ 1. The one video they used to provide formal suicide prevention training featured an instructor who told participants to reference a facility's policy (which did not exist at Vermilion) and rolled her eyes at the Powerpoint slide about liability. Pl. Fact ¶¶ 1-4. Vermilion County's laissez faire approach to its relationship with Crosspoint and the provision of mental health

services left severe gaps in its suicide prevention procedures in which a counselor like Mr. Dewey could clear a suicidal inmate for general population after a perfunctory evaluation of her suicide risk.

**C. Vermilion County's widespread, unconstitutional practices were a moving force behind Kacey Miller's death.**

As a result of these widespread practices, Mr. Dewey received inaccurate information and did not receive information which would have been pertinent to evaluating Kacey's suicide risk—such as her recent suicide attempts. Mr. Dewey believed that although Kacey had snuck a belt into her cell, she had chosen not to make any suicide attempt with it. Pl. Fact ¶ 58-60. Had he spoken to jail staff, he would have been made aware that Kacey attempted suicide *twice* with the belt within the prior two days. He testified that knowledge of an attempt would have made him aware of suicidal intent and cause him to designate that individual as a high suicide risk rather than a moderate one. Pl. Fact ¶¶ 63, 70. His ignorance, facilitated by Vermilion and its staff, was thus a moving force in his decision to return Kacey to general population rather than implement suicide precaution that she would not be released from until she was again cleared by a Crosspoint counselor.

Further, Vermilion's customs allowed Kacey to go through multiple layers of professionals who "assessed" her yet concluded that she was not likely to commit suicide despite *attempting to do so twice* while in custody. These individuals operated on the erroneous assumption that the only pertinent information was Kacey's own answer to whether she was suicidal. Pl. Fact ¶¶ 33, 80, 81, 85. Despite their knowledge that Kacey had just attempted suicide twice, Osterbur and Harding were satisfied when she promised them she would not do it again, and they did not make any mental health professional aware of either alarming event. Pl. Fact ¶ 46, 49, 104-105. These are not the actions of objectively reasonable officers who appreciate the seriousness of an individual's attempt to end their own life. Kacey was only able to get help for her suicide risk when she explicitly asked "to talk to someone." Pl. Fact ¶¶ 38, 48. Predictably, she was assessed by yet another agent of Vermilion who did not conduct an inadequate inquiry into her suicide risk. Like Osterbur and

Harding, Dewey was satisfied with Kacey's empty assurances. Pl. Fact ¶ 83. This custom ensured that Kacey could make two attempts on her own life while in the Vermilion County jail, yet never undergo a suicide risk assessment that accounted for her demonstrated intent.

### D. Multiple underlying violations support *Monell* liability against Vermilion County.

Contrary to Defendants' position, "municipal liability may be found even in the absence of underlying individual liability." *Allison v. Gallagher*, No. 10 C 6887, 2012 WL 4760863, at *2 (N.D. Ill. Oct. 5, 2012) "[A] municipality can be held liable under *Monell*, even when its officers are not, if that outcome would not create an inconsistent verdict." *Savory v. Cannon*, No. 17 C 204, 2022 WL 767169, at *2 (N.D. Ill. Mar. 14, 2022) (quoting *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) (cleaned up)). For example, "[i]t is possible that a jury could find the Defendant Officers immune and not individually liable, while also finding that Plaintiff's constitutional rights were indeed violated and that the City's policies caused the harm." *Est. of Loury by Hudson v. City of Chicago*, No. 16-CV-04452, 2017 WL 1425594, at *3 (N.D. Ill. Apr. 20, 2017).

A municipality could be held liable for the unconstitutional actions of their agent who is not a defendant without rendering an inconsistent verdict. As a contractor for the County, Dewey's constitutional violations[4] can suffice to support the "underlying violation" requirement under *Thomas*, 604 F.3d at 305. A jury could find that conducting a suicidal assessment with hardly any pertinent information; relying almost entirely on whether an individual made an explicit, verbal confirmation of their suicidal intent; not attempting to obtain any information from collateral sources; implementing a safety plan that is impossible for the detainee to carry out as the *only*

---

[4] Plaintiff has settled and released her claims against Crosspoint and Dewey. As a matter of policy, it would not make sense to require a plaintiff to keep a defendant in despite opportunity to resolve the claim via settlement just because plaintiff risks losing her *Monell* claim if that individual is not longer a named defendant who can be held liable at trial. Such would create the absurd situation where plaintiffs must deny good faith negotiations with individual defendants because release of their claims would jeopardize the "underlying violation" component of her *Monell* claims.

backstop to that detainees suicide risk; and engaging in suicide assessments with such a severe lack of appreciation for suicide risk factors were, individually or in the aggregate, objectively unreasonable. And such conduct was facilitated by widespread practices at Vermilion County regarding the transfer of information and cursory suicide assessments.

Alternatively, a jury could find that Nurse Harding, a Vermilion County employee who is not a named defendant in this case, acted objectively unreasonably in failing to notify Crosspoint of Kacey's suicide attempt despite not only her knowledge of the life-threatening situation, but also a face-to-face interaction with Mr. Dewey. Pl. Fact ¶ 105. More to the point, a jury could find that Nurse Harding did so due to the widespread practice at Vermilion County of *not* communicating material information to mental health professionals. A jury could find that the actions of Defendant Harbacek, Defendant Osterbur, former-Defendant Dewey, and/or Nurse Harding were objectively unreasonable *and* caused by the widespread customs of the County. Whether one or all of those findings results in a judgment against a particular named defendant at trial has no bearing on whether Plaintiff has satisfied the elements of *Monell.*

**E. Vermilion County does not get two free suicides.**

Finally, Plaintiff addresses Defendants argument that Plaintiff cannot prove a widespread custom because there were "only" six suicide attempts and one completed suicide in the five years preceding Kacey's death. To establish a widespread custom, a plaintiff must show a repeated pattern of past bad *acts*, not past *injuries*. *Davis,* 452 F.3d at 695. To establish a widespread custom or policy, the plaintiff [is] not required to show that [the municpality's] alleged repeated pattern of delay (*i.e.,* its alleged past "bad acts") actually caused pain and suffering to other inmates in need of medical intervention (*i.e.,* repeated past injuries). *Id.* In *Woodward*, the plaintiff presented no evidence that a single suicide had ever occurred at the jail prior to the suicide subject to the allegations. *Woodward,* 368 F.3d at 929. The Court still found "a direct link between [defendant's] policies and [plaintiff's]

suicide. That no one in the past committed suicide simply shows that [defendant] was fortunate, not that it wasn't deliberately indifferent." Like CMS in *Woodward,* **Vermilion County "does not get one free suicide."** *Id.* The *Monell* inquiry should be focused on the repeated *acts* of Vermilion County and its agents—not whether they were fortunate enough to avoid highly predictable consequence of those actions until September of 2020.

The number of suicides at the Vermilion County Jail is not dispositive of the *Monell* claim because it improperly prioritizes the injuries associated with widespread bad acts. "[E]vidence of a single violation of federal rights can trigger municipal liability if the violation was a "highly predictable consequence" of the municipality's failure to act. *Id.* Vermilion County lacked a formal, written policy to guide its employees on how to prevent suicide[5] despite knowledge that suicide and mental health issues alike were significant problems for their detainee population. Pl. Fact ¶¶ 1, 13-14. Vermilion's 30(b)(6) witness testified that the County had experienced an increase in detainees who make suicidal statements or attempts, engage in self-harm, and were on mental health medication in the preceding fifteen years. Pl. Fact ¶ 13. Sheriff Hartshorn himself testified that Vermilion County had been considering adding a more specific policy on suicide prevention since "late 2019 and early 2020" because we were seeing many more people come into the jail with psychological problems." Pl. Fact ¶ 14. The written policies were finally updated to include a suicide prevention policy two months after Kacey Miller killed herself. Pl. Fact ¶ 15.

Importantly, unlike in *Woodward*, there is evidence in this record of prior suicides at Vermilion County. During the period that Vermilion County did not have a suicide prevention

---

[5] Defendant attempts to render the lack of a formal policy immaterial by claiming the Illinois County Jail Standards served as a sufficient written policy regarding suicide prevention such that there was no real need to for Vermilion County to implement its own written policy. What Vermilion County fails to address, however, is that those standards specifically require jail administrators to establish a "written manual of policies and regulations for the operation of the jail" that includes suicide prevention, but Vermilion County had no suicide prevention policy at the time of Kacey's death.

policy, there were six suicide attempts and one completed suicide in the five years preceding Kacey Miller's. ECF 33 at 21. Captain Osterbur responded to the completed suicide himself. Pl. Fact ¶ 8. Vermilion's 30(b)(6) witness responded to a serious attempt in 2019 in which a woman was blue in the face and unconscious after trying to hang herself with her bra. Pl. Fact ¶ 9. While Defendants characterize it as "only" six attempts and one completed suicide, Plaintiff submits that such tragic and alarming occurrences—combined with the admitted knowledge of increasing mental health issues in the jail and a need for formal suicide protocols—render the consequences in this case even more predictable than in *Woodward*.

Vermilion County continues to have problems preventing suicide and self-harm. In the two years following Kacey's death, Vermilion County jail has seen at least eight incidents involving suicide attempts or self-harm and, tragically, one completed suicide. Pl. Fact ¶ 16. One of the suicide attempts involved a woman hanging herself from the showerhead. Id. Other than implementing a formal policy, Vermilion County has not made any changes to its suicide prevention training or crisis intervention operations and continues to use Crosspoint. Id. Such continued persistence of suicidal behavior in the jail indicates a broader lack of intent by Vermilion County to address deficiencies in suicide prevention policies.

## VII. <u>State Claims</u>

Plaintiff's state law claims alleging willful and wanton conduct should not be dismissed because, for all the reasons described *supra*, Defendants Harbacek, Osterbur, and The question of whether conduct was willful and wanton is generally reserved for the trier of fact unless the Court can decide as a matter of law that plaintiff failed to adduce sufficient evidece. *Bragado v. City of Zion/Police Dep't,* 839 F. Supp. 551 (N.D. Ill. 1993). Illinois state law does not allow jail staff to act with reckless disregard to a known suicide risk. See *Id.* (jury reasonably found jail staff willful and wanton in responding to suicide risk where they failed to comply with regulation and knew that the

decedent was an active suicide risk). Vermilion County exhibited objective unreasonableness and deliberate indifference to Kacey's suicide risk. Under Illinois law, the failure to implement a reasonable suicide prevention measure can constitute a breach of a jailer's duty to prevent suicide. *White v. Watson*, No. 16-CV-560-JPG-DGW, 2018 WL 2047934 at *14 (S.D. Ill. May 2, 2018). Defendants' sole argument that the state claims should be dismissed is that they rise and fall with the federal claims. Since Plaintiff's federal claims should prevail, this argument should be rejected.

## VIII. Conclusion

Plaintiff has set forth sufficient evidence that Kacey Miller's Osterbur and Harbacek acted objectively reasonably by failing to notify health professionals of Kacey's acute suicide risk when they were actively relinquishing their responsibility for Kacey's safety to those professionals. A widespread custom throughout the jail of preventing the exchange of information between Crosspoint and Vermilion staff was the moving force behind the decisions to retain such important information about Kacey's safety. The survival of Plaintiff's federal claims also supports survival of her state claims.

Wherefore, Plaintiff respectfully requests this Honorable Court deny Defendants' motion for summary judgment in its entirety.

Respectfully Submitted,

Dated: September 9, 2024

By: *s/ Sam Harton*
Attorney for Plaintiffs
Bhavani K. Raveendran
Sam Harton
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
Email: braveendran@rblaw.net;
sharton@rblaw.net