E-FILED
Monday, 31 March, 2025 03:57:31 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURTS**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| **DEEA MILLER,** ***Individually and as Independent Administrator of the Estate of KASEY MILLER, Deceased,*** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 22-2029** |
| | ) | |
| **VERMILION COUNTY SHERIFF'S OFFICE** ***et al.,*** | ) | |
| **Defendants.** | ) | |

**ORDER**

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court for ruling is a Motion for Summary Judgment (Doc. 33) filed by Defendants Barbara Harbacek, Colin Osterbur, and the Vermilion County Sheriff's Office ("Vermilion County"). Plaintiff Deea Miller, Administrator of the Estate of Kasey Miller, has filed a response (Doc. 51), and Defendants have replied (Doc. 54). Plaintiff has also filed a Motion to Withdraw (Doc. 57).

**I. Background**

On February 1, 2022, Defendants Harbacek, Osterbur, and Vermilion County removed to this Court Plaintiff's First Amended Complaint (Doc. 1) filed in the Circuit Court of the Fifth Judicial Circuit of Illinois after the September 27, 2020 death of Kacey Miller[1] during her detention at the Vermilion County Jail ("Jail"). Plaintiff identified

[1] The Court will hereafter refer to Plaintiff Deea Miller as Plaintiff and Kasey Miller as Miller.

Crosspoint Human Services ("Crosspoint"), John Dewey, John Doe Crosspoint Employees 1-3, John Doe Sheriff's Deputy 1 ("Doe 1"), Officer Harbacek, Captain Osterbur, and Vermilion County as Defendants. On March 3, 2025, the Court dismissed Defendants Crosspoint, Dewey, and John Doe Crosspoint Employees I, II, and III based on their mutual agreement with Plaintiff (Doc. 56).

Plaintiff raises the following state law claims: Wrongful Death —Willful and Wanton (Count I) and Survival—Willful and Wanton (Count II) against Defendant Vermilion County; Wrongful Death—Willful and Wanton Conduct (Count V) and Survival—Willful and Wanton Conduct (Count VI) against Defendants Doe 1, Harbacek and Osterbur. Plaintiff's amendment further raises Federal claims under the Eighth and Fourth Amendments for Failure to Provide Adequate Medical Care and Protect from Self-Destructive Tendencies (Counts IX and X) against Doe 1, Harbacek and Osterbur and a claim for municipal liability under *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (Count XI) against Vermilion County.

**II. Preliminary Issues**

Plaintiff's Motion to Withdraw (Doc. 57) is granted. The Clerk of the Court is directed to terminate Bhavani Raveendran as counsel of record for Plaintiff.

In March 2024, the Court denied (Doc. 32) Plaintiff's Motion for Leave to File a Second Amended Complaint (Doc. 23). Specifically, the Court determined that Plaintiff's attempt to substitute an identified individual for John Doe Sheriff's Deputy 1 was time-barred by the two-year statute of limitations and Plaintiff neither established good cause

for her delay under Federal Rule of Civil Procedure ("Rule") 16(b)(4) nor mistake under Rule 15(c)(1)(C)(ii). Thus, Defendant John Doe Sheriff's Deputy 1 is dismissed as a party.

## III. Motion for Summary Judgment

### A. Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "If the moving party has properly supported his motion, the burden shifts to the non[]moving party to come forward with specific facts showing that there is a genuine issue for trial." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015).

"When opposing a properly supported motion for summary judgment, the non[]moving party must 'cit[e] to particular parts of materials in the record' or 'show[] that the materials cited do not establish the absence … of a genuine dispute.'" *Melton v. Tippeconoe County*, 838 F.3d 814, 818 (7th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)). All facts must be construed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in his favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A scintilla of evidence supporting the nonmovant's position is insufficient to defeat a motion for summary judgment; "there must be evidence on which the jury could reasonably find for the [nonmovant]." *Id*. at 252.

**B. Undisputed Material Facts**[2]

Kacey Miller arrived at the Jail shortly after 4 p.m. on Sunday, September 19, 2020. (Def. UMF 30.) Although not permitted, Miller brought a belt into the Jail and was placed with other female detainees in a dormitory setting. (*Id*. at 32-33.)

On September 21, 2020, Miller requested medical care for withdrawal symptoms. (*Id*. at 39.) Miller had been diagnosed with both mental health and substance abuse disorders, which afflicts about thirty percent of detainees in the United States. (*Id*. at 38.) At about 1:45 p.m. on September 21, 2020, Miller unsuccessfully attempted to hang herself in the shower of her assigned dormitory using the belt. (*Id*. at 36; Pl. UMF 20.) Another dormitory detainee, Toi Lewis, saw Miller with the belt wrapped around her neck. (Pl. UMF 21.) Miller attempted suicide a second time in the cell she shared with Lewis on A-Block by looping the belt through a metal divider on the cell window and hanging herself with it. (*Id*. at 22.) When confronted by Lewis, Miller told Lewis that on both occasions, she was not attempting suicide. (*Id*. at 23.)

Defendant Harbacek was hired as a correctional officer on July 13, 2020, and did not interact with Miller until September 22, 2020, when Harbacek escorted Miller to see

[2] The Court provides only the undisputed facts relevant to its determination from the parties' dispositive motions using their respective numbering.

Nurse Harding based on Miller's medical request. (Def. UMF 34, 40.) Harbacek simultaneously escorted Lewis for an unrelated medical issue. (*Id.*)

Nurse Harding was familiar with Miller from her prior detentions, had treated her between five and seven times, and had a good rapport with Miller. (*Id.* at 41.) At some point during this medical visit, detainee Lewis told Defendant Harbacek that Miller had smuggled a belt into the Jail and had attempted suicide twice. (*Id.* at 43; Pl. UMF 24-25.) Harding was present when Lewis told Harbacek that Miller had attempted suicide, possessed a belt, and that Lewis was worried about Miller. (Pl. UMF 28.)

Detainee Lewis' statement was the first time any Jail official was told Miller had attempted suicide during September 2020. (Def. UMF 44.) When Nurse Harding asked Miller if she was suicidal, Miller responded no, adding that if she were going to commit suicide, she would tell Harding. (*Id.* at 44.) Miller also told Harding that she only smuggled in the belt to see if she could evade detection. (*Id.* at 47.) Miller did not appear sad or upset at that time. (*Id.*)

Defendant Osterbur met with Miller in the Jail's attorney room. (*Id.* at 48.) Osterbur asked Miller if she had attempted suicide or had thoughts of suicide. (*Id.*) Miller told Osterbur she had not attempted suicide and did not have suicidal thoughts. (*Id.* at 49.) Osterbur did not see any marks on Miller's neck or other physical indications that Miller had tried to hang herself. (*Id.* at 50.) Osterbur told Miller that if her mental state changed, she should tell officers or a nurse that she wanted to talk to someone, and the Jail would facilitate that request. (*Id.* at 51.) While Osterbur knew of Miller before September 2020,

as she had been detained at the Jail previously, Osterbur was not aware of any specific information regarding her mental health conditions or prior suicide attempts. (*Id*. at 35.)

The following day, September 23, 2020, Miller told Defendant Harbacek she wanted to talk to someone but did not say why. Miller appeared "a little bit more sad" but was not crying. (*Id*. at 53.) Harbacek inferred that the request was related to the events that occurred on September 22, 2020. (*Id*.) After Harbacek relayed Miller's request to Defendant Osterbur and Nurse Harding, a call was made to Crosspoint, requesting a mental health professional. (*Id*. at 54.)

Crosspoint counselor Dewey met with Miller between 10:55 a.m. and 11:32 a.m. that morning and performed a crisis assessment. (*Id*. at 55.) Dewey conducted the evaluation in the Jail's visiting room, separated from Miller by glass, but he could see her body language. (*Id*. at 56.) Jail staff gave Dewey ample time as needed, and no Jail official pressured or influenced Dewey on how to conduct that assessment. (*Id*. at 57.)

Dewey testified that he did not seek details on Miller's background from any Jail official because, in his professional judgment, he did not want to cloud his initial assessment. (*Id*. at 59.) At the time Dewey performed Miller's assessment, he was a Qualified Mental Health Professional with a master's degree in psychology, had conducted several hundred crisis assessments for suicidal ideation, and had received classroom and on-the-job training in the field of mental health. (*Id*. at 58.)

Consistent with his regular practice upon completing a crisis assessment, once Dewey finished, he notified Sergeant Kevin Maskel over the intercom that Miller was

clear to be returned to general population. (*Id*. at 65.) Dewey told Nurse Harding, "I'm done with [Miller], I think she's fine" and that he was recommending Miller go back to general population. (*Id*. at 66.) Harding responded, "Ok," or "good." (*Id*.) Even though Dewey's notes state that he "consulted" with Maskel and Harding, Dewey did not solicit input from either of them regarding Miller's housing. (*Id*. at 67.) By "consulted," Dewey meant that he told Maskel and Harding about the decision he reached. (*Id*.)

Dewey's recommendation was followed, and Miller was returned to general population. (*Id*. at 68.) Whenever a Crosspoint counselor conducted a crisis evaluation on a detainee and recommended either the detainee be sent to or remain on suicide watch or the detainee was cleared for general population, the Jail always followed that recommendation. (*Id*. at 69.)

From September 23, 2020, when Miller was returned to general population, to September 27, 2020, (1) Miller did not tell any correctional officer or County employee that she was feeling suicidal (*Id*. at 70); (2) no detainee reported to a correctional officer that Miller had made a suicidal statement (*Id*. at 71); (3) Miller did not request medical care or mental health services, either through the kiosk system or directly to any correctional officer (*Id*. at 72); (4) no detainee reported to a correctional officer that Miller attempted suicide or self-harm (*Id*. at 73); and (5) no detainee reported to a correctional officer that Miller's mood or attitude underwent a significant change. (*Id*. at 74.)

Around 10:00 a.m. on September 27, Defendant Harbacek entered A-Block and let Miller and four other detainees out of their cells. (*Id*. at 78) Harbacek stayed about three

minutes, and during that time, Harbacek talked to the female detainees, changed the television channel at their request, and saw Miller make a phone call that was not completed because the recipient did not answer. (*Id*.) Harbacek observed Miller acting normally. (*Id*. at 79.)

Miller's cellmate, Lewis, testified that Miller was acting "like a normal person" on the morning of September 27, 2020, adding that she was not "different at all." (*Id*. at 80.) Miller entered her cell at 10:11 a.m., shut the door, and covered the window to her cell door to block the view to the inside. (*Id*. at 81.) The other female detainees saw that Miller had blocked the window to her cell, which they knew was against the rules, but did not report it because they thought she wanted privacy. (*Id*. at 82.) The monitoring video that correctional officers used to observe showed Miller entering her cell alone at 10:11 a.m. but did not show her blocking the cell window because it is impossible to see if that cell window was being covered from the inside. (*Id*. at 83.) At about 10:39 a.m., one of the other detainees opened the door to Miller's cell, saw her hanging, and immediately called for assistance. (*Id*. at 84.) Miller was transported to a local hospital but never regained consciousness and was taken off life support on September 28, 2020. (*Id*. at 90-91.)

Defendant Harbacek did not interact with or learn anything new about Miller between September 24 and 26, 2020. (*Id*. at 76.) Defendant Osterbur did not receive any current information about Miller or hear about Miller requesting services or making statements between September 23 and 27, 2020. (*Id*. at 77.) Osterbur noted he was not working on September 27th. (*Id*.)

**C. Analysis**

Defendants state their dispositive motion is "centered" on the following three facts: (1) after a detainee reported Miller had earlier attempted unsuccessfully to commit suicide at the Jail, Miller denied being suicidal when asked by Defendant Osterbur, (2) when Miller requested to speak to someone a day later, a professional counselor from Crosspoint was provided to evaluate Miller, and (3) the counselor cleared Miller for placement in the Jail's general population. (Def. MSJ Reply, Doc. 54 at 1.)

**1. Eighth and Fourth Amendments Claims**

In *Estate of Wallmove v. Oneida County*, the Seventh Circuit articulated the following legal standard applicable to claims that Jail officials failed to protect a detainee from harming themselves:

> [A] plaintiff must show that declining to take preventative action was objectively unreasonable. More specifically, that standard asks a plaintiff to establish that a "defendant did not take reasonable available measures to abate [the] risk, *even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved*—making the consequences of the defendant's conduct obvious. And factfinders may consider only information available at the time, resisting the temptation to employ the 20/20 vision of hindsight. Last note: the inquiry takes a broad view, looking at any "objective circumstances potentially relevant to a determination" of reasonableness. These include the prevailing penal circumstances at the facility, accounting for the need to preserve internal order and discipline and to maintain institutional security.
>
> Our past cases have applied this law to jailhouse suicides, together setting forth key principles for assessing objective unreasonableness. An express statement that [the deceased] was not considering suicide from the deceased himself

> weighs heavily against objective unreasonableness. That conclusion flows from a recognition of on-the-ground circumstances: practically speaking, [n]ot every prisoner who shows signs of depression can or should be put on suicide watch. The facts should point directly at suicidality, for a deceased's general distress and history of psychiatric treatment would give a reasonable officer notice of general distress and a history of psychiatric treatment, not risk of suicide. For that reason, when an officer has no reason to think a detainee is suicidal, it is not objectively unreasonable to take no special precautions.

99 F.4th 385, 391 (7th Cir. 2024) (emphasis in original) (internal quotation marks, citations, and parenthetical information omitted).

The undisputed facts establish that neither Defendants Harbacek nor Osterbur were aware of Miller's suicide attempts before September 22, 2020. When detainee Lewis informed Harbacek that Miller had a belt and had attempted to take her life twice, Harbacek ensured the belt was seized, and Osterbur interviewed Miller.

During his interview with Miller, Osterbur did not observe any physical marks indicative of an attempted suicide by strapping a belt to the neck. When Osterbur inquired whether Miller was contemplating taking her life, she responded that she had not attempted suicide and was not suicidal. Osterbur told Miller that she should contact an officer or a nurse if she wanted to talk to someone, and the Jail would facilitate her request. When Miller asked to speak with someone the next day, counselor Dewey met with Miller that morning to perform a crisis assessment. After completing his evaluation, Dewey notified a Jail official and Nurse Harding of his recommendation that Miller be returned to the general population.

Consistent with the Jail's practice of deferring to a crisis counselor's recommendations, Miller was placed in general population where she remained for the next four days. During that period, Miller did not request a crisis counselor or further medical or mental health care. Additionally, Miller did not exhibit any behavior or give any indication to anyone that she was contemplating suicide. In this regard, Defendant Harbacek noted that after releasing Miller from her cell at 10 a.m. on September 27, 2020, she observed Miller acting as a sane, rational person, which was consistent with testimony provided by detainee Lewis, Miller's cellmate, that Miller was acting normally. Unfortunately, approximately forty minutes after being released from her cell on the morning of September 27, 2020, Miller took her life.

In her response, Plaintiff cites cases in support of her assertion that Defendants Harbacek and Osterbur had reasons to believe Miller was suicidal. However, the fact patterns presented in the cases Plaintiff relies upon are distinguishable. For example, in *Mombourquette ex rel. Mombourquette v. Amundson*, 469 F.Supp.2d 624 (W.D. Wis. 2007), the district court denied the defendants' dispositive motion based on undisputed facts that established the plaintiff had abrasions on her neck and lacerations on each of her wrists from attempting to commit suicide. *Id*. at 631. Additionally, after returning from a local hospital, a psychiatrist recommended the plaintiff be kept on suicide watch based on his opinion the plaintiff was having suicidal ideations associated with her imposed sentence, which was ignored to the plaintiff's detriment. *Id*. at 632, 641.

Similarly distinguishable are the facts in *Sanville v. McCaughtry*, 266 F.3d 724 (7th

Cir. 2001), in which the plaintiff told certain prison officials he planned to commit suicide, knew the plaintiff had written a will, attempted suicide in the past, and the plaintiff's mother called the prison stating that the plaintiff was paranoid, suicidal, and in trouble. *Id*. at 737.

Even when viewed in the light most favorable to Plaintiff, the presented facts do not establish that Defendants Harbacek and Osterbur failed to take reasonably available measures to abate a risk of harm to Miller, especially given that a mental health professional cleared Miller to return to general population instead of placing her on suicide watch. *See Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019) (noting that the Seventh Circuit has "long recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment").

**2. Monell Claim**

"[T]he *Monell* theory of municipal liability applies in § 1983 claims brought against private companies that act under color of state law." *Whiting v. Wexford Health Sources*, Inc., 839 F.3d 658, 664 (7th Cir. 2016); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) ("Private corporations acting under color of state law may, like municipalities, be held liable for injuries resulting from their policies and practices."); *Iskander v. Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (applying § 1983 to private corporations).

To prevail on a *Monell* claim against Vermilion County, Plaintiff must have

evidence of "(1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the moving force behind the constitutional injury." *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020) (internal quotation marks omitted).

The parties do not dispute that if a municipality, such as Defendant Vermilion County, delegates complete authority to set policy to a private contractor, such as Crosspoint, then the contractor's policy is treated as the municipal policy for purposes of *Monell* liability. Thus, Plaintiff asserts that "[t]here appears to be no dispute that Vermilion County delegated the duty of identifying suicide risk then recommending the appropriate prevention measures to Crosspoint and its 'qualified mental health professionals," such as counselor Dewey. (Pl. Res. Doc. 51 at 42.)

From this basis, Plaintiff asserts that "the normal course of conduct is for Vermilion County employees to *withhold* material information to Crosspoint staff." (*Id*. at 43.) Plaintiff then refers to counselor Dewey's testimony that he did not seek details regarding a detainee's background from Jail officials because, in his professional judgment, he did not want to cloud his assessment. (*Id*.) However, Plaintiff's argument fails to establish *Monell* liability because Dewey's stated approach did not follow established Crosspoint policy.

As Defendants correctly note, testimony from Plaintiff's Rule 30(b)(6) witness instructs counselors to consult with collateral sources when conducting their assessments

as follows:

> Q. Are the crisis counselors trained on information gathering from other sources other than the individual in crisis?
>
> A. Yes. They are trained to talk to any collateral that may have information.
>
> Q. What do you mean by 'collaterals"?
>
> A. So[,] at the Vermilion County Jail, that could be the nurse, the correctional officers, the sergeant. At the hospitals, it would be the nurses[ and] the physicians. There are often family members present, so at the time of crisis, they can have conversations with family members as well to gather more information.
>
> Q. And why are crisis counselors trained to speak to collateral sources?
>
> A. Because they can provide relevant information.

(Michelle Nelson Dep. Doc. 33-4 at 31:10-24, 32:1-2.)

"The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original).

Here, Plaintiff's evidence demonstrated that Crosspoint policy requires gathering collateral information, which counselor Dewey expressly disregarded. Thus, the record belies any claim of *Monell* liability against Vermilion County based on the failure to gather collateral information.

**3. State Law Claims**

"The Illinois Survival Act provides that actions to recover damages for injury to the person, except actions for slander and libel, survive death." *Cleveland v. Rotman*, 297 F.3d 569, 574 (7th Cir. 2002) (citing 755 ILCS 5/27-6).

"Under the Illinois Wrongful Death Act, 740 ILCS 180/1, a plaintiff must establish that the: '(1) defendant owed a duty to decedent; (2) defendant breached that duty; (3) the breach of duty proximately caused decedent's death; and pecuniary damages arising therefrom to persons designated under the Act.'" *Thompson v. City of Chicago*, 472 F.3d 444, 457 (7th Cir. 2006) (quoting *Leavitt v. Farwell Tower Ltd. P'ship*, 625 N.E.2d 48, 52 (Ill. App. Ct. 1993)).

"Willful and wanton conduct is a statutory exception that defeats the immunity provided by section 2-202 of the Tort Immunity Act." *Moran v. City of Chicago*, 676 N.E.2d 1316, 1323 (Ill. App. Ct. 1997) (citing 745 ILCS 10/2-202). Under Section 2-202, "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. The Act defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210. "Willful and wanton conduct, as contemplated in [the Tort Immunity Act], consists of more than mere inadvertence, incompetence, or unskillfulness." *McDowell v. Village of Lansing*, 763 F.3d 762, 768 (7th Cir. 2014) (quoting *Geimer v. Chi. Park Dist.* 650

N.E.2d 585, 592 (Ill. 1995)).

Defendants contend that Plaintiff's state law claims alleging willful and wanton conduct fail because the record in this case does not establish such conduct, which Plaintiff asserts is sufficient. However, for the reasons the Court has noted *supra*, the provided record neither establishes that Defendants Harbacek and Osterbur engaged in willful and wanton conduct as defined *supra* nor that Vermillion County policies and practices contributed to the unfortunate death of Kasey Miller.

Accordingly, Defendants' Motion for Summary Judgment (Doc. 33) is granted.

**IT IS THEREFORE ORDERED:**

1) **Plaintiff's Motion to Withdraw (Doc. 57) is GRANTED. The Clerk of the Court is DIRECTED to terminate Bhavani Raveendran as counsel of record for Plaintiff Deea Miller.**

2) **The Clerk of the Court is DIRECTED to DISMISS John Doe Sheriff's Deputy 1 as a Defendant.**

3) **Defendants' Motion for Summary Judgment (Doc. 33) is GRANTED. The Clerk is DIRECTED to enter judgment in favor of Defendants and against Plaintiff. All deadlines and internal settings are VACATED.**

4) **If Plaintiff wishes to appeal this judgment, she must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). If Plaintiff does choose to appeal, she will be liable for the $605.00 appellate filing fee regardless of the outcome of the appeal.**

ENTERED March 31, 2025.

s/ *Colleen R. Lawless*

**COLLEEN R. LAWLESS**
**UNITED STATES DISTRICT JUDGE**